SPARKS *v.* STATE OF INDIANA.

[No. 30,669. Filed September 20, 1967.]

*John R. Jett,* of Terre Haute, for appellant.

*John J. Dillon,* Attorney General and *Carl E. VanDorn,* Assistant Attorney General, for appellee.

JACKSON, J.—Appellant was charged by indictment in the Vigo Circuit Court of Vigo County, Indiana, with the crime of First Degree Murder as the result of the death of Brenda Dawn Frederick from a gunshot wound.

The shooting and death occurred on October 8, 1962. On that date appellant was seventeen years of age, and the victim of the shooting, Brenda Dawn Frederick, was three years and four months of age. Brenda's father, Peter Frederick, is appellant's half brother.

Appellant had been employed to take care of the Frederick children (including Brenda) during the day while the children's parents worked. On the day in question appellant had sent the two older children to school. Brenda remained at home with the appellant, and later a neighbor boy, Jimmie Walker, aged four years, came to the house to play with her.

About 11:35 a.m. on October 8, 1962, the police received a call from appellant to come to the Frederick home where they found the body of Brenda on the floor and appellant present. Brenda had been shot in the head, The gun, a 22 caliber revolver, was lying on a tricycle seat a few feet from the body. The police took appellant to the City Hall with instructions to "Hold for Probation Department." On the way to the City Hall and while there, the police interrogated appellant as to what had occurred at the Frederick home. Appellant first stated that Brenda had shot herself and signed a statement or confession to that effect, which was introduced at the trial as State's Exhibit No. 11.

Later, on October 8, 1962, after having talked to Jimmie Walker and after requiring appellant to submit to a paraffin test of his hands, in which test nitrate was found on the right hand, the police obtained a second statement from appellant of what had happened. This statement was introduced in evidence as State's Exhibit No. 12. This statement in substance was to the effect that he saw Brenda with the gun in her hand, he rushed over to her, placed his left arm around her and with his right hand attempted to get the gun away from her, and in the process the gun went off resulting in her injury and death. These two confessions were made on the afternoon of October 8, 1962, at the Terre Haute City Hall.

Thereafter, appellant was taken by the police to the Frederick home where, in the presence of and at the direction of the police, he re-enacted the shooting "along the things that he had stated in his second statement. Detective Long had the statement in his possession as Donald re-enacted the events."

The police officers interrogated appellant on October 9, 1962, and on the morning of October 10, 1962, he was, with permission from his father, taken from Terre Haute to Indianapolis by Terre Haute police officers and given a lie detector test. After such test, he was returned to Terre Haute where he was again intensively interrogated by the police officers and finally by Mr. Berry the Prosecuting Attorney. After being interrogated by Mr. Berry, appellant signed the third confession on October 10, 1962, which confession was introduced in evidence as State's Exhibit No. 14. The third confession was to the effect that he had pointed the gun at Brenda to scare her. When she did not become scared, but merely pushed the gun away, be became angry and shot her.

On October 11, 1962, appellant was for the first time charged with the commission of a crime, to-wit: Murder in the first degree, when taken to the court of Hon. Lee Easton, Justice of the Peace of Harrison Township, Vigo County, Indiana.

Appellant entered a plea of not guilty to the indictment and requested trial by jury. The jury, after trial, by its verdict, found appellant guilty of the crime of Second Degree Murder and sentenced him to imprisonment in the Indiana State Prison for life.

After verdict and before judgment was rendered thereon, appellant filed his motion for a new trial, such motion contained one hundred thirteen grounds. Thereafter appellant filed his supplemental motion for a new trial containing two additional grounds, for a total of one hundred fifteen grounds for new trial. Obviously it is impossible to set out, in an opinion of reasonable length, all of these grounds. Generally the grounds related to alleged error in giving certain numbered instructions tendered by the State; refusing to give certain numbered instructions tendered by the appellant; error in overruling appellant's motion for directed verdict; error in overruling objections to statements made by the State and refusing to withdraw the submission of the cause from the jury; error in allegedly permitting the Sheriff's department to move appellant about the court house in view of the jury while shackled; numerous objections to questions propounded various witnesses, such objections being embodied in objections designated as stipulated objections Nos. 1, 2 and 3. These objections and others were interposed numerous times to certain questions propounded to witnesses produced by the State.

These objections go to the several constitutional rights of the appellant therein allegedly violated, as well as the right of the State to introduce, in the case in chief, three separate and several contradictory confessions obtained from appellant, a seventeen year old boy with no previous police record, without benefit of counsel or an opportunity to consult with his parents, or anyone else, outside the presence of the police, while being held by the police without warrant and without charge.

The Assignment of Errors contains four specifications as follows:

"1. The Court erred in overruling Defendant's Motion for New Trial.

"2. The Court erred in overruling Defendant's Supplemental Motion for New Trial.

"3. That the verdict of the Jury is contrary to law.

"4. That the verdict of the Jury is not sustained by sufficient evidence."

While there are many grounds contained in the Motion for New Trial and properly saved, we deem it unnecessary to encumber this opinion with a discussion of any of them other than the question as to the admissibility of the confessions.

On the weight of authority it appears that the true test as to the admissibility of a confession is that it be voluntarily made and that in making it the accused was aware of the probable consequences of his act.

One of the early decisions relating to the use of such confessions antedates the rulings of the U. S. Supreme Court in that field, but enunciates the correct principal of law later followed by that court wherein it has long been held "[t]he law will not suffer a prisoner to be made the deluded instrument of his own conviction." 2 Hawkins, Pleas of the Crown 595, (8th Ed. 1824).

The question whether a confession was coerced depends upon whether the defendant's will was overborne at the time he confessed, for is such was the case, his confession cannot be deemed the product of a rational intellect and a free will.

". . . It is true that the police have to interrogate to arrest; it is not true that they may arrest to interrogate. I would hold that any confession obtained by the police while the defendant is under detention is inadmissible, unless there is prompt arraignment and unless the accused is informed of his right to silence and accorded an opportunity to consult counsel." *Reck* v. *Pate* (1961), 367 U. S. 433, 448, 6 L. Ed. 2d 948, 958, 81 S. Ct. 1541.

The true test of the admissibility of a confession is whether it was made freely, voluntarily and without compulsion or inducement of any sort.

The use of an involuntary confession requires reversal of the judgment of conviction even though there is sufficient other evidence in the record from which the jury might have found guilt. *Haynes* v. *Washington* (1963), 373 U. S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336.

"The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves. Accordingly, the actions of police in obtaining confessions have come under scrutiny in a long series of cases." *Spano* v. *New York* (1959), 360 U. S. 315, 320, 321, 3 L. Ed. 2d 1265, 1270, 79 S. Ct. 1202. (For cases cited see footnote 2 at p. 321.)

"The police were not therefore merely trying to solve a crime, or even to absolve a suspect . . . They were rather concerned primarily with securing a statement from defendant on which they could convict him. The undeviating intent of the officers to extract a confession from petitioner is therefore patent. When such an intent is shown, this Court has held that the confession obtained must be examined with the most careful scrutiny, and has reversed a conviction on facts less compelling than these. *Malinski* v. *New York,* 324 U. S. 401. Accordingly, we hold that petitioner's conviction cannot stand under the Fourteenth Amendment." *Spano* v. *New York, supra,* at p. 323, 324.

In the case at bar the appellant was a youth seventeen years of age. He had no previous experience with police officers, or with regard to his constitutional rights to counsel, to speak or to remain silent, or to advice that his statement might be used against him in a criminal prosecution, or of the incriminating significance of the third statement which he signed at 6:00 p.m. on October 10, 1962, under what must be considered coercive circumstances.

As previously noted, on October 8, 1962, appellant signed two confessions, the first at 1:25 p.m. to the effect that the victim had taken the gun from the dresser drawer in another room and had shot herself. After appellant had made that statement, the police talked with a playmate of the victim who was present at the time of the shooting. They also ran a paraffin test on appellant's hand and found nitrate present. They confronted appellant with these facts, appellant then made a second statement at 3:40 p.m. in which he stated that he and Brenda had wrestled for possession of the gun and that she was shot when it went off accidently.

After appellant had made these statements, the police officers, on October 9, 1962, took appellant to the scene of the shooting and had him re-enact the incident. Thereafter on the morning of October 10, 1962, the police took appellant to Indianapolis for a lie detector test, returning to Terre Haute about the middle of the afternoon. Thereupon an interrogation of the appellant was pursued on the basis of the purported disclosures resulting from the lie detector test.

As a result of these interrogations appellant signed the third confession at 6:00 p.m. October 10, 1962. The following day appellant was brought before a Justice of the Peace and formally charged with murder in the first degree. Interestingly, interrogating officers, Jack D. Ford and John O'Leary and appellant himself, testified that the prosecuting attorney, Ralph Berry, entered into the interrogation on October 10, 1962, before its consummation resulted in appellant signing the third confession. This fact was denied by Berry at the trial. However, he did testify that:

> ". . . these things were done with the consent of the defendant, that no one forced him to go to Indianapolis to take a lie detector test or dragged him out of jail to take him there for the re-enacement (sic) at the scene. These were voluntary things that he was doing on his own. He was trying to convince the Police Department that he wasn't guilty so he was volunteering these things and he

was cooperating with them with that purpose in mind . . . I'm stating that his purpose at the time of volunteering all these things was so he could clear himself. He thought, as a matter of fact, even after he signed the third statement that probably nothing would happen to him."

It is true that there is evidence that appellant's father consented to the lie detector test and stated that he wanted to get to the truth of the matter. However, from an analysis of the record, it is apparent that the consent was given in the light of the fact that at that time appellant had made two statements, one in which he said that Brenda had shot herself, and the other that she had been killed accidently while she and appellant were wrestling over possession of the gun. Under neither of these circumstances, as delineated in the statements, could appellant be guilty of a crime. The fact that appellant did accompany the police officers and did take the lie detector test is, in view of the record before us, not to be considered a voluntary consent, nor can the consent of the father, in view of the record here, operate to bind the appellant. The uncontradicted record in this case discloses that appellant was at no time permitted to engage in a private conversation with his parents out of the presence of police officers until after the first degree murder charge had been filed against him.

In this case, as in the case of *Spano* v. *New York, supra,* following the taking of the lie detector test appellant had become the accused, and the purpose of the interrogation was to "get him" to confess his guilt despite his constitutional right to remain silent. This fact is shown by the evidence that the prosecuting attorney was called in to consumate the interrogation prior to the drafting and signing of the third confession. Appellant testified that he did not know that he could not be required to take the lie detector test, and not having been so informed, reference to the purported results of that test in inducing appellant to make the third confession, constituted an undue exercise of

influence, as well as a denial of his constitutional rights in obtaining such confession.

In the case at bar, by the testimony of the prosecuting attorney himself, it was appellant's belief that even the third confession he signed would not incriminate him. This fact further supports the conclusion that it was the responsibility and duty of the State to inform appellant that he need not make a statement and that any statement he might make would be used against him. Also, his father and mother, who were his natural guardians, should have been informed about the interrogation by the police officers and the prosecuting attorney for the purpose of fixing guilt for the crime of murder upon the appellant, who obviously was unaware either of his rights or of the consequences of his act. The testimony of John O'Leary, one of the interrogating officers, relative to the third confession is quite enlightening to the effect that "[h]e was having a hard time expressing himself . . ." so he, O'Leary wrote a note to Mr. Loudermilk, a city detective, to get Mr. Berry, the prosecuting attorney, stating that the boy wanted to tell something, but just couldn't get started. Mr. Berry came and Mr. O'Leary testified that the appellant seemed to get started after he talked to Mr. Berry. The statement being, in question and answer form, as follows:

"Q. He got started pretty good here then?
"A. That was after Mr. Berry talked to him."

A confession taken under the above circumstances cannot be said to have been made freely, knowingly and voluntarily, and its admission in evidence should have been excluded by the trial court.[1]

---

1. Although State's exhibits Nos. 12 and 14 contain in the first paragraph of each statement to the effect that he made the statement voluntarily and that he had been advised that he had the right to an attorney and that anything he might say in the statement could be used in a court of law at the time of trial, all the evidence in the case is to the effect that this paragraph was merely a formal statement embodied in most

. In view of the voluminous record in this case, consisting of three bound volumes of testimony, exhibits, pleadings, objections and rulings which show conclusively that appellant was not only deprived of his constitutional rights to counsel, to advice that whatever he said not only could, but would be used against him, the refusal of the officers to permit him to discuss his situation and his rights with his parents, the obviously coerced confessions and the timely objections to their use and introduction in evidence as State's Exhibits or otherwise, compels us to agree that coerced confessions are, of course, inadmissible regardless of their alleged truth or falsity. *Rogers* v. *Richmond* (1961), 365 U. S. 534, 5 L. Ed. 2d 760, 81 S. Ct. 735.

It is clearly evident that in permitting the introduction in evidence of the three coerced confessions, the court below committed reversible error.

On the authority of the cases heretofore cited this cause is reversed and remanded to the trial court with instructions to sustain appellant's motion for a new trial.

Hunter, C. J., Lewis and Mote, JJ., concur.

Arterburn, J., concurs in result.

NOTE.—Reported in 229 N. E. 2d 642.

confessions, and although the confessions were signed by the appellant, the facts stated in such first paragraph were not supported by any evidence in the case. In fact all the evidence, uncontradicted, is to the effect that appellant was not advised as to his constitutional rights.