DOUGLAS TIMOTHY LEWIS v. STATE OF INDIANA.

[No. 571S131. Filed October 19, 1972.]

*High C. Kirtland, Jr., Dutton, Kappes & Overman,* of Indianapolis, *Barrie C. Tremper, Meyers & Tremper,* of Fort Wayne, for appellant.

*Theodore L. Sendak,* Attorney General, *Robert F. Colker,* Deputy Attorney General, for appellee.

DeBruler, J—This is an appeal from a conviction for first degree murder in a trial by jury in the Allen Circuit Court, the Honorable Bruce Bloom presiding. Appellant was sentenced to life imprisonment.

Appellant's allegation is that the trial erred in admitting over appellant's objection testimony of Police Officers Minnick and Andrews concerning appellant's oral confession to them during custodial interrogation. When the interrogation took place appellant was a juvenile and he argues that, as a result of that fact, the supposed waiver of his rights was not made voluntarily and intelligently. Officers Minnick and Andrews testified concerning the events surrounding the confession as follows:

On September 9, 1969, they were assigned the investigation of a murder and apparent robbery of Orville VanBrunt that had taken place on March 23, 1969, on Brooklyn Avenue in Fort Wayne. From an informer they obtained appellant's

name as having had some connection with the crime. On September 10, 1969, at 9:00 a.m. the two officers went to appellant's home in Fort Wayne. Appellant was a seventeen year old high school sophomore who lived with his mother in Fort Wayne, his father living in another city. When the officers arrived they showed their badges to appellant and an older man, and a young girl, apparently appellant's uncle and cousin. The police told appellant his name had come up "in certain investigations" they were conducting and they would like to have appellant accompany them to the police station to talk to them. Appellant agreed to go as soon as he changed his clothes. The officers knew appellant was seventeen years old at the time. They did not tell appellant what the investigation related to and in their opinion appellant was not at that time under arrest. During the ride to the station the officers ask the appellant where his mother was and he said he did not know where she worked or how to reach her. Appellant asked what he was supposed to be involved in and they told him that they would talk to him after they got to the station. They arrived at the station at approximately 9:25 a.m. and Andrews testified "we told him that we would like to talk to him in reference to several investigations, but before we did this, we had to, we had a formality that we had to go through as to his rights." Andrews handed appellant a copy of the Fort Wayne Police Department standard *Miranda* rights and waiver form and had the appellant read it. Appellant said he could read and he understood it. Andrews then read it over again out-loud to appellant. Appellant signed beneath this statement of rights and again beneath the statement of waiver.

The officers proceeded to question the appellant for fifteen minutes concerning his alleged involvement in a car theft. Then Sergeant Andrews told appellant they had information that he was involved in a "very serious crime" and showed him a photograph of the dead body of Orville VanBrunt. Appellant looked at the photo, paused and told them he was involved in

the crime. Appellant was informed he could get life imprisonment for inflicting a bodily injury during a felony, but he was not advised that he could also receive the death penalty for first degree murder. The police asked appellant to tell them all he knew about the crime and appellant told them the following story.

Appellant and another juvenile, Earl Richards, were walking toward the Market on Brooklyn Avenue shortly after midnight on March 23, 1969. They saw the victim Orville Van-Brunt staggering down the street. VanBrunt approached the youths and called them a dirty name and appellant followed him down to an open field while Richards stood on the corner. Appellant picked up a piece of board and hit VanBrunt on the back of the head. The victim fell to his knees and lunged at appellant whereupon appellant again hit him on the head. Appellant started to hit VanBrunt again but Richards stopped him. Appellant took the victim's billfold and tried to get his ring but could not get it off his finger so Richards took it off. They threw the board in a field and did the same with the victim's billfold after removing fifteen dollars it contained. As the pair walked toward the Richards' house, Steven Mc-Elvene drove by and picked up the appellant. Appellant gave McElvene the ring wrapped in a five dollar bill as repayment for a loan. Other testimony showed that VanBrunt died of two blows to the head inflicted by a blunt instrument.

Appellant's confession was completed by 10:30 a.m. Andrews asked appellant if he wanted to make a phone call and appellant said that the only person he would want to talk to would be his mother. This occurred after the appellant confessed and the police had not yet located his mother although they had been trying since appellant had arrived at the station.

At approximately 10:30 a.m. the police asked the appellant to accompany them to the scene while they looked for the board and the billfold involved in the crime. Neither was found. On

the way back to the station they picked up Earl Richards and took him to the station with appellant. The two were questioned together and appellant's story was confirmed with minor discrepancies.

At 1:00 p.m. Officers Andrews and Minnick began taking a written statement from appellant. As part of the preliminary questions they asked appellant if he wanted to talk with an attorney before answering any questions and appellant said yes. The taking of the statement then ceased and the police called in a public defender who arrived at approximately 2:30 p.m. At 1:30 p.m. the appellant's mother had arrived and she was permitted to see appellant right away. Appellant then refused to answer any more questions or sign any statements. The earlier oral statement however was introduced at trial.

It is a long and well established principle that alleged waivers of such fundamental constitutional rights as the right to counsel and against self-incrimination will only be upheld after careful inquiry into their basis. *Johnson* v. *Zerbst* (1938), 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461; *Brady* v. *U.S.* (1970), 397 U.S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747. The State bears the burden of showing that the accused was informed of his rights in clear and unambiguous language. *Miranda* v. *Arizona* (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694; *Williams* v. *Twomey*, 11 Cr. L. Rep. 2502 (7th Cir. 1972). If an accused decides to waive these rights he must be sufficiently aware of the consequences of what he is doing and he must make his decision voluntarily, knowingly and intelligently. *Miranda* v. *Arizona, supra; Nacoff* v. *State* (1971), 256 Ind. 97, 267 N. E. 2d 165; *Mims* v. *State* (1970), 255 Ind. 37, 262 N. E. 2d 638. In order to insure that the accused's waiver is a knowing and intelligent one the courts have considered such factors as his educational level, the seriousness and complexity of the charge lodged against him, his mental condition, and his age. *Von-Moltke* v. *Gillies* (1948), 332 U.S. 708, 68 S. Ct. 316, 92 L. Ed.

309; *Williams* v. *Peyton*, 404 F. 2d 528 (4th Cir. 1968) ; *Day* v. *U.S.*, 357 F. 2d 907 (7th Cir. 1966). This last factor continues to be a source of confusion for all parties involved in the important and difficult area of waiver of fundamental constitutional rights.

The authorities seeking to question a juvenile enter into an area of doubt and confusion when the child appears to waive his rights to counsel and against self-incrimination. They are faced with the possibility of taking a statement from him only to have a court later find that his age and the surrounding circumstances precluded the child from making a valid waiver. There are no concrete guidelines for the authorities to follow in order to insure that the waiver will be upheld. The police are forced to speculate as to whether the law will judge this accused juvenile on the same plane as an adult in regard to the waiver of his constitutional rights, or whether the court will take cognizance of the age of the child and apply different standards. We held in *Sparks* v. *State* (1967), 248 Ind. 429, 229 N. E. 2d 642, that the parents of a seventeen year old juvenile should be informed of an interrogation being conducted with their son and that the juvenile should be informed of his rights. In a later case it was held that a fourteen year old girl cannot be said to have knowingly waived her rights, even though the police properly informed her of them, when she was questioned without her parents or counsel present. *McClintock* v. *State* (1969), 253 Ind. 333, 253 N. E. 2d 233.

Apparently therefore a fourteen year old girl cannot be held to have waived her rights by the same standards as an adult. But this is not to say that this is the limit of the rule. Whether or not an older juvenile can be held to an adult standard is a question which the police are forced to confront and answer in the heat of an investigation. Furthermore, they are forced to proceed without indication of what alternative procedures would be constitutionally acceptable. It is harmful to the system of criminal justice to require law enforcement

authorities to second guess the courts in the area of constitutional rights. Clearly defined procedures should be established in areas which lend themselves to such standards in order to assure both efficient police procedure and protection of the important constitutional rights of the accused. Age is one area which lends itself to clearly defined standards.

If the police are placed in a quandry when confronting a juvenile accused, the juvenile is perhaps in the most serious predicament of his short life. In most cases he is aware that he is in trouble. If not under formal arrest he is usually being questioned in a police-dominated atmosphere and finds himself in some instances cut off from anything familiar or comforting to him. Many times he faces his accusers alone and without benefit of either parent or counsel. It is in these circumstances that children under eighteen are required to decide whether they wish to give up the intricate, important and long established fifth and sixth amendment rights. It indeed seems questionable whether any child falling under the legally defined age of a juvenile and confronted in such a setting can be said to be able to voluntarily, and willingly waive those most important rights.

The concept of establishing different standards for a juvenile is an accepted legal principle since minors generally hold a subordinate and protected status in our legal system. There are legally and socially recognized differences between the presumed responsibility of adults and minors. Indeed the juvenile justice system, which deals with most offenses committed by those under eighteen, is substantially different in philosophy and procedure from the adult system. This State, like all the others, has recognized the fact that juveniles many times lack the capacity and responsibility to realize the full consequences of their actions. As a result of this recognition minors are unable to execute a binding contract, I.C. 1971, 29-1-18-41, Burns § 8-141, unable to convey real property, I.C. 1971, 32-1-2-2, Burns § 56-102, and unable to marry of their own free will, I.C. 1971, 31-1-1, Burns

§ 44-101. It would indeed be inconsistent and unjust to hold that one whom the State deems incapable of being able to marry, purchase alcoholic beverages, I.C. 1971, 7-1-1-32(10), Burns § 12-610, or even donate their own blood, I.C. 1971, 16-8-3-1, Burns § 35-4407, should be compelled to stand on the same footing as an adult when asked to waive important Fifth and Sixth Amendment rights at a time most critical to him and in an atmosphere most foreign and unfamiliar.

For many years the high courts of our country have recognized the necessity for a different approach to juvenile waiver of rights from that of adults, but have not specified exactly what methods should be employed. The United States Supreme Court in *Haley* v. *Ohio* (1948), 332 U.S. 596, 68 S. Ct. 302, 92 L. Ed. 224, over twenty years ago stated that juveniles in their waiver of constitutional rights "cannot be judged by the exacting standards of maturity." 332 U.S. at 599.

In that same opinion the court noted, concerning interrogations of juveniles:

> "He, (juvenile) needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it may not crush him." 332 U.S. at 600.

In a more recent case the court found that the right against self-incrimination belonged to juveniles as well as adults and also found that:

> "This court has emphasized that admissions and confession of juveniles requires special caution." *In Re Gault* (1967), 387 U.S. 1, 45, 87 S. Ct. 1428, 18 L. Ed. 2d 527.

The court also reiterated that a special procedure might be required to insure a juvenile waiver of Fifth and Sixth Amendment rights were truly voluntary:

> "We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique—

but not in principle—depending upon the age of a child and the presence and competence of the parents." 387 U.S. at 55.

Although it is apparent that the juvenile accused should be availed of some special protection in the area of his Fifth and Sixth Amendment rights the precise procedure to be adopted has never been clearly formulated. The President's Crime Commission seems to feel that counsel should be appointed a juvenile, "whenever coercive action is a possibility" without requiring any choice by either child or parent. *National Crime Commission Report,* p. 87. Various commentators have advocated the total exclusion of any pre-hearing confession regardless of the circumstances. 19 Hastings L. J. 29, at 43-44 (1967). We do not feel however that such rules take cognizance of the realities of the situation, or of the real problems posed in the area of juvenile waivers. We feel that a juvenile as well as any other citizen may waive his Fifth and Sixth Amendment rights as long as certain safeguards are present which recognize the inherent differences between adults and minors in this situation and insure that any waiver is truly voluntary.

We hold therefore that a juvenile's statement or confession cannot be used against him at a subsequent trial or hearing unless both he and his parents or guardian were informed of his rights to an attorney, and to remain silent. Furthermore, the child must be given an opportunity to consult with his parents, guardian or an attorney representing the juvenile as to whether or not he wishes to waive those rights. After such consultation the child may waive his rights if he so chooses provided of course that there are no elements of coercion, force or inducement present. This approach has been advocated by several commissions who have studied this area and we believe it represents the best solution to a difficult and re-occurring problem. *Model Rules for Juvenile Courts,* Rule 25, Evidence (1969), proposed by the Council of Judges of the National Council on Crime and Delinquency;

*Proposed Indiana Rules of Juvenile Procedure,* Rule 9. Having a familiar and friendly influence present at the time the juvenile is required to waive or assert his fundamental rights assures at least some equalization of the pressures borne by a juvenile and an adult in the same situation.

The rule adopted here does not mean that a minor's confession is per se inadmissible but merely holds that, as a result of the age of the accused, the law requires certain specific and concrete safeguards to insure the voluntariness of a confession. The long standing tradition that juveniles can waive their right to silence or to an attorney is continued, but at the same time another long termed tradition, that such waivers require special precautions to insure it be done knowingly and intelligently, is recognized.

We believe that this rule goes far in protecting the juvenile from waiving his rights simply because of the unfamiliarity or hostility of his surroundings. At the same time it lays down a concrete and specific procedure for the authorities to follow in order to dispel some of the confusion and doubt which confronts them in the area of juvenile interrogation and waiver of rights.

This cause is reversed and remanded for a new trial.

Prentice, J., concurs; Arterburn, C.J., concurs in result with opinion in which Givan, J., concurs; Hunter, J., dissents without opinion.

### OPINION CONCURRING IN RESULT

ARTERBURN, C.J.—I concur in the principles enunciated in the majority opinion as to waiver of the right against self-incrimination and other constitutional rights as they apply to juveniles in *criminal* cases. I do not agree that they should be extended to cover juvenile proceedings, as might be drawn from the majority opinion. Juvenile procedure is not considered to be criminal in nature. The objective of the juvenile proceeding is informality for the purpose of rehabilitation and

reform. If we give the juvenile process all of the characteristics of a criminal trial, including the constitutional privleges of a crminal defendant, we undermine the whole purpose and object of juvenile proceedings. If we do that, we might just as well do away with juvenile proceedings and try all juveniles in the criminal courts where we have the apparatus and procedures sufficiently refined to protect their constitutional privileges.

Our Court, after *In Re Gault* (1967), 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527, is unconsciously drifting to the point where juvenile proceedings will have all the characteristics of criminal trials, and we will have lost all the benefits accruing from the non-criminal juvenile process.

Givan, J., concurs.

NOTE.—Reported in 288 N. E. 2d 138.