# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**ELLEN M. O'CONNOR**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE MODESITT COOPER**
**ANN L. GOODWIN**
Deputy Attorney General
Indianapolis, Indiana

FILED

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DUANE LEE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1105-CR-225 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Kurt Eisgruber, Judge
Cause No. 49G01-0911-FA-94526

**May 17, 2012**

**OPINION - FOR PUBLICATION**

**ROBB, Chief Judge**

## Case Summary and Issue

Following a home invasion, robbery, rape, and police chase, Duane Lee, who was then seventeen years old, was arrested. While in custody, authorities acted on Lee's mother's consent to swab his hands, fingers, and penis for DNA evidence. DNA test results of such swabs were entered into evidence and a jury found Lee guilty of thirteen offenses, upon which the trial court entered a judgment of conviction: burglary as a Class B felony, rape as a Class A felony, six counts of criminal deviate conduct as Class A felonies, robbery as a Class B felony, resisting law enforcement as a Class A misdemeanor, criminal confinement as a Class B felony, intimidation as a Class C felony, and pointing a firearm as a Class D felony. On appeal, Lee raises a single issue, which we restate as whether the trial court committed fundamental error in allowing the State to introduce into evidence the DNA test results obtained pursuant to Lee's mother's consent without her meaningful consultation with Lee and without Lee knowingly and voluntarily waiving his rights. We conclude that the police acted improperly in swabbing Lee's penis and the trial court erred in allowing results of that DNA test into evidence. We also conclude that other evidence presented renders the error harmless; therefore, we affirm Lee's convictions.

## Facts and Procedural History[1]

During the evening of November 11, 2009, three men, wielding at least one gun among them, broke down the door to K.P.'s boyfriend's apartment and entered the home.

---

[1] On April 18, 2012, we held oral argument at the Walden Inn and Conference Center, DePauw University, in Greencastle, Indiana. We thank counsel for their advocacy and Walden Inn and DePauw

2

One wore a black shirt and a ski mask, the second wore a blue shirt, and the third wore a red shirt. They ordered K.P. to lie on the floor while they ransacked the home for valuables and then left. Moments later, before K.P. could leave the apartment to report what had happened, the three men returned.

Ordered at gunpoint, K.P. walked to the bathroom and removed all of her clothes but her socks. K.P. was five months pregnant and told them so. At least one fondled her breasts and then two left the bathroom and closed the door leaving K.P. alone with the man in the black shirt and ski mask and his gun. The man in the black shirt forced his fingers into K.P.'s vagina, unzipped his pants, and ordered her to place his penis in her mouth. She did so until he ejaculated in her mouth. He left the bathroom for a moment and upon returning he ordered she place his penis in her mouth again. The man in the blue shirt also entered the bathroom, placed a gun to K.P.'s head, and demanded she perform oral sex upon him, too. K.P. threw up and the man in the blue shirt forced his penis in her mouth again before exiting the bathroom. When the man in the blue shirt left the bathroom, the man in the black shirt forced his penis into K.P.'s mouth yet again. At some point when the man in the black shirt was speaking to K.P., she recognized his eyes and mouth as those of Lee. She had met Lee before and knew him to be her boyfriend's sister's children's father. Transcript at 102-03. The man in the blue shirt returned to the bathroom where K.P. was and partially inserted his penis into K.P.'s anus, but K.P. removed it and the man in the blue shirt began violent vaginal intercourse with K.P. One of the other two men told the man in the blue shirt that

University for their hospitality.

3

they were leaving, and the three males then left the apartment.[2] K.P. sought help and her neighbor called police.

Officer Aaron Hamer, responding to the emergency call, spotted a male crouched in dark clothes near K.P.'s apartment and asked the figure to show his hands because Officer Hamer thought he saw a gun in the figure's pocket. The figure began running and Officer Hamer chased him through the neighborhood, running across yards and vaulting fences. Officer Hamer ordered the figure to stop several times and tased the figure, but the figure ignored the orders to stop, broke away from the taser, and continued running. Officer Hamer finally caught up to and grabbed the figure, who punched and kicked Officer Hamer. Officer Hamer handcuffed the figure, who then identified himself as Lee.[3] Another officer soon brought K.P. nearby in a police vehicle and shone a bright light on Lee, who was handcuffed and standing next to a police vehicle for K.P. to see. K.P. told officers that he was one of the perpetrators. A black ski mask, a gun, and a cellular phone were recovered along the route that Officer Hamer chased Lee.

Lee was transported directly to the office of Detective Derek Cress, and Lee's mother also arrived there in response to a call from police. Lee's mother was summoned because Lee was under the age of eighteen. Id. at 309. Lee was either intoxicated or physically exhausted, and Detective Cress had a difficult time waking Lee. Id. at 312. Lee requested

---

[2] It appears from the record that during K.P.'s sexual assault, whomever of the three who was not with K.P. was either vandalizing or continuing to plunder the home. The record also indicates the three targeted this home because they sought drugs or cash from K.P.'s boyfriend, who lived there.

[3] The record also indicates that, by this time, Officer Hamer answered in the affirmative when asked if the figure wore black colored clothing. See Tr. at 226, 231.

use of the restroom and Detective Cress later testified he "helped him assisted [sic] him by his arm and walked him down the hallway to the bathroom and in this kind of situation [officers] leave the door open and usually a detective stands in the doorway and it was me this time that did that and noticed Mr. Lee had to prop himself against the wall in order to stand up and urinate."[4] Id. at 312-13. Lee was not permitted to wash his hands.

Detective Cress also presented Lee's mother with a form by which to provide consent to a search, informed her of her rights as Lee's parent, and, at 3:35 a.m., requested she sign the form so officers could obtain DNA swabs of Lee's person. The typed form reads in pertinent part: "I hereby CONSENT TO A SEARCH WITHOUT A WARRANT by officers . . . of the following described residence and/or motor vehicle[.]" Ex. at 49 (State's Exhibit 27). "[R]esidence and/or motor vehicle" were crossed out, and in its place was handwritten: "Person – Duane T. Lee, B/M, . . . (17) DNA swabs taken from Lee's hands, fingers, & penis for the purpose of DNA comparison." Id. Lee's mother signed the form. Lee was then transported to a hospital and a forensic examining nurse swabbed Lee's hands, fingers, and penis in a private room while an officer stood by for security purposes.[5] While at Detective Cress's office, Lee's mother also called Lee's cellular phone and the phone, found along the route Officer Hamer chased Lee, then rang.

---

[4] During a sidebar, counsel for the State and Lee discussed with the trial court the potential relevance of Lee appearing to the detective too tired or intoxicated to make a statement and whether to raise the issues of 1) Lee's potential waiver of his Fifth Amendment right against self-incrimination, and 2) whether officers sought a statement from him at all. See Tr. at 304-08.

[5] Detective Cress testified that Lee was "more alert at this time and . . . easily accessible as far as conversation." Tr. at 314. Detective Cress also testified that he "briefly . . . explain[ed] to him why [the two went to the hospital] and it's to obtain some evidence from his person and a greater explanation is given once

5

The State charged Lee with fourteen counts: burglary as a Class B felony, rape as a Class A felony, seven counts of criminal deviate conduct as Class A felonies, robbery as a Class B felony, resisting law enforcement as a Class A misdemeanor, criminal confinement as a Class B felony, intimidation as a Class C felony, and pointing a firearm as a Class D felony.

At trial, the consent to search form which Lee's mother signed was entered into evidence and a laboratory technician testified as to the results of DNA testing on the swabs of Lee's hands, fingers, and penis. Specifically, DNA test results showed that K.P.'s DNA was found on Lee's penis. Id. at 907-08. K.P. could not be excluded as a contributor to DNA traces on Lee's left hand, and her DNA was positively identified in samples of Lee's right hand. Id. at 910-11. Lee did not object to any testimony or exhibit regarding his DNA swabbing or the testing thereof. In addition, test results of DNA swabs of K.P.'s person revealed that Lee cannot be excluded as a contributor to DNA from semen found in an external lip swab of K.P., id. at 901, and of a dental floss sample of K.P., id. at 905. According to DNA testing of the ski mask found along the route Office Hamer chased Lee, Lee cannot be excluded as a contributor – his information was present in thirteen areas and at a low level in the remaining two areas tested. Id. at 906-07. Lee's fingerprints were also found on the counter of the bathroom sink/vanity of K.P.'s home. Id. at 926-27. At trial K.P. testified she finished cleaning the bathroom sink/vanity with Clorox or Lysol wipes just prior to the intruders' first entrance. Id. at 41.

the nurse gets there." Id.

The jury found Lee guilty of all counts except for one count of criminal deviate conduct.  The trial court entered a judgment of conviction and, following a sentencing hearing, sentenced Lee to fifty-two years, of which five were suspended.  Lee now appeals his convictions.  Additional facts will be supplied as appropriate.

Discussion and Decision

I.  Standard of Review

Lee argues the trial court committed fundamental error in allowing the State to introduce into evidence DNA test results of the swabs it took of Lee's hands, fingers, and penis.  Generally, the admission of evidence is within the trial court's discretion and we review decisions to allow items into evidence for an abuse of discretion.  Ziebell v. State, 788 N.E.2d 902, 908 (Ind. Ct. App. 2003).  However, where a party fails to object at the time an item is introduced into evidence, any error in allowing the item into evidence must be fundamental error to warrant reversal.  Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010). Fundamental error is an exception to the general rule requiring contemporaneous objection that is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process."  Id.  This exception applies only to "egregious circumstances," and must either "make a fair trial impossible" or constitute "clearly blatant violations of basic and elementary principles of due process."  Id. (citations omitted).

II.  Lee's Rights

A.  The Juvenile Waiver Statute and Exigent Circumstances

7

Lee's argument that the trial court fundamentally erred in allowing DNA test results into evidence is based on his underlying argument that the State failed to prove that it had legal authority to swab his penis for DNA.[6]  In McLain v. State, 274 Ind. 250, 410 N.E.2d 1297 (1980), our supreme court concluded that swabbing a criminal defendant's penis for biological evidence requires constitutional justification under the Fourth Amendment to the United States Constitution.  Id. at 254, 410 N.E.2d at 1301; see Brent v. White, 398 F.2d 503, 505 (5th Cir. 1968) (concluding that scraping a defendant's penis to obtain menstrual blood of the victim's type invoked Fourth Amendment protections).

These constitutional protections[7] implicate Indiana's juvenile waiver statute, Indiana Code section 31-32-5-1, which provides:

> Any rights guaranteed to a child under the Constitution of the United States, the Constitution of the State of Indiana, or any other law may be waived only:
> (1) by counsel retained or appointed to represent the child if the child knowingly and voluntarily joins with the waiver;
> (2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:
>     (A) that person knowingly and voluntarily waives the right;
>     (B) that person has no interest adverse to the child;
>     (C) meaningful consultation has occurred between that person and the child; and
>     (D) the child knowingly and voluntarily joins with the waiver; or

---

[6] Lee conceded at oral argument that he no longer challenges the State's authority to swab his hands and fingers for DNA evidence.  We therefore need not determine their propriety.

[7] In Lee's appellate brief, he discusses this issue in the context of protections under the Fifth Amendment to the United States Constitution; the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and Article 1, Section 14 of the Indiana Constitution, specifically the privilege against self-incrimination.  Lee refers us to D.M. v. State, 949 N.E.2d 327 (Ind. 2011), in which the Indiana Supreme Court described procedural safeguards which it previously established "as a precondition to using a juvenile's statements from a custodial interrogation . . . in court," all in addition to constitutional protections.  Id. at 332-33 (discussing Lewis v. State, 259 Ind. 431, 439-40, 288 N.E.2d 138, 142 (1972)).  Following Lewis, the General Assembly codified the additional protections described in Lewis in what is now Indiana Code section 31-32-5-1.  Id.

(3) by the child, without the presence of a custodial parent, guardian, or guardian ad litem, if:

 (A) the child knowingly and voluntarily consents to the waiver; and

 (B) the child has been emancipated under IC 31-34-20-6 or IC 31-37-19-27, by virtue of having married, or in accordance with the laws of another state or jurisdiction.

The State argues this statute does not apply to Lee because exigent circumstances necessitated an attempt to collect K.P.'s DNA from Lee's person before any such evidence was destroyed.[8] "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are <u>per se</u> unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions. One such exception is when exigent circumstances exist." <u>Ware v. State</u>, 782 N.E.2d 478, 481 (Ind. Ct. App. 2003) (quotations and citations omitted). Exigent circumstances have been found when a suspect is fleeing or is likely to take flight to avoid arrest and where incriminating evidence is in jeopardy of being destroyed or removed. <u>State v. Straub</u>, 749 N.E.2d 593, 597 (Ind. Ct. App. 2001).

> Exigent circumstances justifying a warrantless search exist where the police have an objective and reasonable fear that the evidence is about to be destroyed; the arresting officers must have a reasonable belief that there are people . . . who are destroying or about to destroy the evidence. In such a case, the evidence's nature must be evanescent and the officers must fear its imminent destruction.

<u>Harless v. State</u>, 577 N.E.2d 245, 248 (Ind. Ct. App. 1991) (citations omitted). Police officers cannot simply act and then later claim their actions were justified by exigent circumstances. <u>Hawkins v. State</u>, 626 N.E.2d 436, 439 (Ind. 1993) (concluding exigent

---

[8] At oral argument the State conceded that it would no longer rely upon the jurisdiction argument it

9

circumstances did not exist where officers claimed exigent circumstances justified their warrantless search of a home to find the cash used in a controlled drug-buy by stating that the home was as "busy as a drive-in restaurant" and they might lose their buy money in subsequent transactions, even though only fifteen transactions were executed in the house during the preceding two weeks). In addition, the seriousness of the offenses being investigated does not render circumstances exigent. Mincey v. Arizona, 437 U.S. 385, 393-94 (1978). Similarly, officers cannot forgo seeking a search warrant because to do so is not as "simplified" as conducting a search without and later claiming exigent circumstances existed. See id. Courts review the evidence presented to determine whether police "had an objective and reasonable fear that the evidence was about to be destroyed." Esquerdo v. State, 640 N.E.2d 1023, 1027 (Ind. 1994). "The burden is on the prosecution to demonstrate exigent circumstances to overcome the presumption of unreasonableness . . . ." Straub, 749 N.E.2d at 598.

Accordingly, we review the record to determine whether evidence was presented that exigent circumstances existed. In doing so, we acknowledge that Lee's failure to indicate in any way that the exigency of the circumstances regarding obtaining his penile swab was in question might have skewed the record. This is because without an objection by Lee, the State was not pressed to present evidence regarding the exigency of the circumstances. Nevertheless, we proceed with this review to determine whether evidence of exigent circumstances was presented for the following reasons.

articulated, in the alternative, in its appellate brief.

10

First, the law is clear that there is a presumption of unreasonableness when officers conduct a search in reliance upon purportedly exigent circumstances, and the prosecution has the burden to present evidence sufficient to overcome that presumption. Straub, 749 N.E.2d at 598. It is imperative that courts hold the prosecution accountable to meet its burden regardless of what a criminal defendant does or does not argue at trial.

Second – which is more of a practical reason than an application of law – if officers reasonably believed exigent circumstances existed, that belief is usually reflected in the evidence regardless of whether a defendant challenges the purported exigency of the circumstances. Here, the State presented substantial evidence regarding the circumstances leading up to the swabbing, including testimony by Lee's mother and Detective Cress. We deem it appropriate to determine whether the evidence regarding these circumstances sufficiently demonstrates officers held an objective, reasonable belief that evidence was about to be destroyed.

Third, we narrowly tailor our conclusion here to a ruling on whether evidence presented was sufficient to demonstrate exigent circumstances, and do not conclude as a matter of law whether exigent circumstances could have been demonstrated to exist in this case (or that exigent circumstances cannot exist in similar cases).

With all that said, based on the factual record before us, we do not agree with the State that officers actually held an objective, reasonable belief that DNA evidence was about to be destroyed. Substantial evidence was presented regarding the hectic scene prior to officers obtaining the swabs. Detective Cress testified that upon first hearing about what happened,

11

he "quickly realized that [he] needed to be at the scene because it was something that was fresh and something that recently just happened . . . ." Tr. at 289. He continued by explaining the chaotic scene that spanned the neighborhood where Lee was apprehended by Officer Hamer, and noting various officers, friends, and family members milling about. Id. at 289-90. He specifically mentioned that he was trying to "check and secure" "multiple people and multiple locations." Id. at 290. After beginning parts of the investigation and delegating other portions to his colleagues, Detective Cress left the scene and returned to his office because Lee was also, separately, transported to an interview room in the same building as Detective Cress's office. Either Detective Cress or another officer contacted Lee's mother and transported her there as well because Lee was under the age of eighteen.

Detective Cress then had Lee's mother call Lee's cellular phone to confirm that the phone found along the route Officer Hamer chased Lee was in fact Lee's. Detective Cress also presented Lee's mother with a consent to search form, which included a request to consent to swab Lee's penis. At some point, Detective Cress allowed Lee to use the restroom and assisted him in doing so, although he did not allow Lee to wash his hands. Detective Cress then accompanied Lee to the hospital for a forensic examining nurse to administer the DNA swabs of Lee's hands, fingers, and penis.

As relates to a concern that DNA evidence was about to be destroyed, the sole evidence presented is that Detective Cress would not allow Lee be alone in the restroom or to wash his hands after he urinated. Detective Cress did not state why or otherwise elaborate. Nor did Detective Cress make any other statement to suggest his concern about destruction

12

of DNA evidence or whether he took any precautions to ensure that Lee did not wipe his hands or penis on his clothing or any other surfaces.

A crime lab technician later testified as to the fragility of DNA evidence, but a lab technician's testimony does not reflect the beliefs of arresting or investigating officers. We will not impute a lab technician's knowledge of the fragility of DNA evidence to that of a field detective. It would not be reasonable to do so, especially when other evidence in the record suggests that if Detective Cress knew what the lab technician knew, Detective Cress might have attempted to obtain a DNA swab prior to allowing Lee to urinate at all; the technician testified that urination can destroy DNA evidence. Tr. at 916. Further, the evidence presented suggests Detective Cress was more concerned with obtaining Mother's consent to swab Lee's penis than he was with Lee destroying evidence. If Detective Cress actually believed the evidence was about to be destroyed and exigent circumstances existed, there was no reason to obtain Lee's mother's consent (or perhaps even Lee's, for that matter).

The absence of evidence that officers actually believed DNA was about to be destroyed might be due to a lack of evidence that would sufficiently support the State's appellate claim that the officers did so believe, or it might be due to Lee's failure to object and thereby press the State to present evidence thereof. In any event, our narrowly tailored holding is that sufficient evidence of exigent circumstances <u>was not presented at trial</u>. Because it is the State's burden to present such evidence to overcome a presumption of unreasonableness, its failure to overcome that burden renders the admission of such evidence erroneous without another valid justification.

13

On appeal, the State compares this case to two cases from other jurisdictions in which officers apprehended suspects of sexual assaults soon after the crimes occurred and obtained penile swabs of the suspects in a manner such that appellate courts later held the swabs justified by exigent circumstances. See Kaliku v. U.S., 994 A.2d 765 (D.C. Cir. 2010); Ontiveros v. Texas, 240 S.W.3d 369 (Tex. App. 2007), petition stricken. We agree that the offenses under investigation in Kaliku and Ontiveros are similar to this case, and that the officers faced a similar situation in those cases as the officers did here. We conclude differently from Kaliku and Ontiveros because the evidence presented at Lee's trial regarding officers' thoughts and actions do not demonstrate they actually believed Lee might destroy any DNA evidence on his penis.

To further explain, we note the evidence presented in Kaliku and Ontiveros. In Kaliku, the officer who instructed the two defendants about how to obtain the penile swab samples "testified that he did not seek a court order or transport the appellants to a hospital where the sample could have been taken because "[e]vidence could have been wiped away . . . [or] contaminated . . . [or] rubbed away at any time." 994 A.2d at 780 (ellipses and alterations in original). In Ontiveros, a detective investigating a sex assault ordered officers holding the suspect to obtain a penile swab for DNA, either voluntarily or pursuant to exigent circumstances. The detective later testified regarding the urgency:

> The foreign DNA on a human body, in my training and experience, is very fragile. It can be removed and destroyed very readily. Three hours had already elapsed and there was still a possibility that that DNA could be present. It has also been my experience that suspects we have had in the interview rooms, hearing of a penile swab, had attempted to destroy the evidence on videotape during their interrogations.

14

240 S.W.3d at 370.

The Texas Court of Appeals added:

[The detective] testified that he did not know if a magistrate was available at the jail that morning to issue a search warrant. He added that because it was a Sunday morning, "the judges have an extremely large docket from a Saturday night," and he estimated that it "could have been four or five hours before I could have received a search warrant. In that time frame, I believed, after three hours had expired, that DNA could have been damaged." [The detective] testified that a suspect had been known to spit on his hands and try to wipe DNA material off of his penis. He also testified that urine can destroy DNA evidence.

Id.

Detective Cress's short statement that he would not allow Lee to wash his hands, without further elaboration, pales in comparison to the evidence presented in Kaliku and Ontiveros, and is insufficient to overcome the State's burden to demonstrate officers actually held an objective, reasonable belief that evidence was about to be destroyed.[9]

B. Waiver of Lee's Rights

Above, we concluded that evidence of exigent circumstances was not presented. Moreover, at oral argument the State abandoned any argument (which was already implicitly conceded in its appellate brief) that police abided by the juvenile waiver statute. Accordingly, we deem DNA evidence collected from Lee's penis to have been improperly admitted into evidence. The dispositive issue, however, is whether this error rises to the level of fundamental error.

_____

[9] Further, it should be noted that if officers wanted Lee's DNA, exigent circumstances certainly did not exist because Lee's DNA would not change and officers could have obtained a warrant and obtained his DNA

15

### III.  Fundamental or Harmless Error

If the erroneously admitted evidence is merely cumulative of other evidence in the record, it is harmless error and not grounds for reversal.  Bryant v. State, 802 N.E.2d 486, 494 (Ind. Ct. App. 2004), trans. denied.  If a conviction is supported by substantial independent evidence of guilt which satisfies the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction, the error is harmless.  Morales v. State, 749 N.E.2d 1260, 1267 (Ind. Ct. App. 2001).  Fundamental error "applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, . . . the resulting error denies the defendant fundamental due process," or the "egregious circumstances" either "make a fair trial impossible" or constitute "clearly blatant violations of basic and elementary principles of due process."  Brown, 929 N.E.2d at 207 (citations omitted).

We conclude that the improperly obtained penile swab and the DNA test results thereof are not essential to sustain any of Lee's convictions.  Other significant evidence supporting Lee's convictions include: (1) Lee's fingerprints in K.P.'s bathroom, indicating his presence after she washed it before the incident; (2) K.P.'s testimony, Lee's girlfriend's testimony, and Lee's co-defendant's testimony which implicated Lee in the burglary and robbery; (3) Lee's DNA on the ski mask, which indicates he wore the ski mask which was worn by the man in the black shirt and implicates him in the sex assault and other offenses by the man in the black shirt; (4) Lee's DNA was found in K.P.'s mouth as a result of testing

---

later.

K.P. and Lee's hands; and (5) K.P.'s testimony that she identified Lee as the man in the black shirt during the incident because she met and knew Lee prior to this incident. K.P. positively identified Lee's eyes and mouth. She remembered him not only as the man in the black shirt, but as <u>Lee</u> whom she knew prior to these events.

Further, because Lee concedes that the swabs of his hands and fingers were not improper, the State had valid and properly obtained evidence of K.P.'s DNA on Lee's right hand. In addition, the State had a valid sample of Lee's DNA such that it could not exclude Lee as the contributor to DNA from semen found in an external lip swab of K.P. and of a dental floss sample of K.P. We agree with Lee's statement at oral argument that the fact that one cannot be excluded as a contributor does not alone satisfy the State's burden to prove guilt beyond a reasonable doubt. But we conclude that all of this DNA evidence – especially that of K.P.'s DNA on Lee's right hand – and the other evidence of Lee's guilt, numbered one through five above, constitutes substantial independent evidence of guilt. Although the State failed to present sufficient evidence that exigent circumstances existed and the trial court erred in allowing into evidence test results of Lee's penile swab, this error does not rise to the level of fundamental error.

## Conclusion

Lee argues the State improperly swabbed his person without satisfying the requirements of the juvenile waiver statute, which the State argues does not apply because exigent circumstances existed. We conclude that the exigent circumstances exception does not apply in this case, but that the error of allowing the test results into evidence does not rise

to the level of fundamental error. Even without the improper admission into evidence of DNA test results of Lee's penile swabs, none of his convictions would fail. Additional substantial independent evidence of guilt was presented and there is no substantial likelihood the challenged evidence contributed to the convictions. Therefore, we affirm.

Affirmed.

RILEY, J., and CRONE, J., concur.