**Ben CHANEY, Petitioner-Appellant,**

**v.**

**Louie L. WAINWRIGHT, Secretary of the Florida Department of Offender Rehabilitation, Respondent-Appellee.**

**No. 76–3459.**

United States Court of Appeals, Fifth Circuit.

Oct. 31, 1977.

William M. Kunstler, New York City, Louis G. Carres, Tallahassee, Fla., for petitioner-appellant.

Robert L. Shevin, Atty. Gen., Tallahassee, Fla., Anthony C. Musto, West Palm Beach Fla., for respondent-appellee.

Before GOLDBERG and FAY, Circuit Judges, and DUMBAULD,* District Judge.

DUMBAULD, Senior District Judge.

Appellant, Ben Chaney, sought habeas corpus, which was denied by the District Court for the Southern District of Florida. He is serving three life sentences under Florida convictions for participation in three murders.[1] He was found guilty, in each instance, of first degree murder, under a "felony-murder" statute. Florida law classifies as first degree murder a killing "committed by a person engaged in the perpetration of . . . robbery".[2] Appellant contends that without his confessions there would not have been sufficient evidence to convict him; and that they are constitutionally inadmissible.

The Broward County murder was of a collector for an insurance company, who was robbed and shot to death, and whose car was stolen, near Ft. Lauderdale. The victims of the Palm Beach County murders were female college students shot to death near Boca Raton, and the car belonging to one of them was stolen.

Appellant and another black youth, Martin Routrell, left New York and traveled to Florida in company with one Thompson, by whom the younger men were apparently dominated or influenced.[3] Appellant had not told his mother that he was going to Florida. He had left word that he was going to Detroit.[4]

Chronologically, the first murder victim was one John J. Bowes II, a collector of premiums due for an insurance company. The travelers planned a robbery because they needed money.[5] Thompson held up the victim and took him to a wooded area and killed him. Meanwhile, appellant and his companion parked the victim's car and awaited Thompson's return. The $110 taken from Bowes was used as a common fund for the travelers. Appellant denies advance knowledge that Bowes was to be killed. He says he thought it would just be a robbery.[6] This murder took place at Fort Lauderdale, Broward County, Florida, on May 5, 1970.

The next escapade in which appellant was involved was the killing of two female students, Marlene Mahnke and Donna Finch, at Boca Raton, Palm Beach County, Florida, on May 14, 1970.[7]

Lastly, in Jasper County, South Carolina, on May 15, 1970, John R. Bazemore, employee at a Simons Fireworks stand, was killed. A fellow employee, James Woods, testified that appellant and Thompson came in to the store and bought $3 worth of fireworks. Later, Thompson and Routrell asked for sparklers, and reentered the store. Appellant remained at the wheel of their getaway car. At a signal, Routrell fired upon Bazemore, wounding him mortally. Woods returned the fire and scuffled with his assailants, killing Thompson. Appellant and Routrell fled in their car.[8]

Appellant and Routrell were taken into custody at a road block at 10:00 A.M. on May 15, 1970, in Jasper County, South Carolina. According to appellant, he immediate-

---

* Senior District Judge of the Western District of Pennsylvania, sitting by designation.

1. Two sentences in Palm Beach County, Florida, are concurrent with each other, but consecutive to the sentence in Broward County, Florida, for an earlier murder.

2. West's Florida Statutes (1976) Title XLIV, c. 782.04(1).

3. Tr. 307, Palm Beach County Trial.

4. *Ibid.*, 214.

5. Tr. 375, Broward County trial.

6. *Ibid.*, 381. "Q. Why did he kill the insurance man? A. I have no idea. Maybe so he wouldn't identify him." *Ibid.*, 327.

7. The record before this Court does not contain the evidence received at the trial regarding the circumstances of these killings.

8. Tr. 511–18, Broward County trial.

ly asked the state trooper arresting him for permission to make a phone call to his mother, at home. He was told to wait and ask the sheriff.[9] At the time of his arrest, appellant was seventeen years and ten months old, having been born on July 12, 1952.

According to appellant, as soon as he was taken into the Sheriff's office, he repeated the request to call his mother. The Sheriff's response, according to appellant, was that the call might be made "as soon as I tell him what he wanted to know." [10]

The Sheriff testified that appellant's request to call his mother was made before answering any questions, as "He wanted to let her know what happened," [11] that he was permitted to make the call, but did not reach his mother; that later he called again and got her. Appellant was questioned between the two calls.[12]

In view of the resolution of any conflicts in the testimony by the finder of the facts, it may be accepted as established that appellant before giving his statement, after receiving his Miranda warnings,[13] did not request an attorney,[14] but did request permission to call his mother.

The finder of facts rejected appellant's assertion that he told the sheriff that the reason he wanted to call his mother was so that she could get him an attorney; and likewise rejected appellant's assertion that the sheriff would not permit him to call until he had told the sheriff "what he wanted to know." The probability that the sheriff's version was correct is accentuated by the fact that appellant had not told his mother he was going to Florida, but was going to Detroit.

Appellant's case in this Court must rest on the contention that appellant's request to call his mother was the legal equivalent of a request for an attorney, and of a persistent refusal to talk until an attorney was present. As stated with the eloquence of exaggeration in appellant's brief (p. 14), "The request by a child in custody for an opportunity to telephone a parent prior to interrogation is a per se invocation of the child's Fifth and Sixth Amendment rights." Appellant also contends that his statements were involuntary, by reason of coercion by psychological forces.

It strains the imagination to view appellant as a "child" involved in a juvenile court delinquency. The apron-string tie was not strong in a youth of almost eighteen, who left home without saying good-bye to his mother or informing her truthfully as to his plans.

From the record one gains the impression that appellant was "street-wise" and well aware of his rights. He was familiar with jails, and they held no terrors for him.[15] He was familiar with police procedure, and had been arrested before. He had read the FBI report about the death of his brother James Chaney who was killed, along with two Northern civil rights workers, by a Mississippi sheriff and deputies in 1964. The bodies were found 44 days later in a dam.[16] Appellant himself took part in civil rights activities. Appellant was also familiar with attorneys and knew what they do.[17]

---

9.  Tr. 184, Palm Beach County Trial.

10. Ibid., 185–89; Tr. 436–37, Broward County trial.

11. Tr. 429–32, 442–43, Broward County trial.

12. Appellant's statement to Sheriff Raymond dealt with the South Carolina killing. The next day, after a night in jail and renewed Miranda warnings, he made a statement to detective Farinato about the Florida killings.

13. Miranda warnings, of course, are those prescribed by the Supreme Court's opinion in Mi-

randa v. Arizona, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

14. Indeed, appellant explicitly states, with regard to his statement on June 16th, "I didn't want one." Tr. 441, Broward County trial.

15. Tr. 442, Broward County trial.

16. Tr. 204, 205, 245, Palm Beach County trial. Appellant was also astute in assessing criminal techniques. See note 6, supra.

17. Ibid., 217, 235.

He knew he could have had an attorney but did not want one.[18]

Appellant's position is that he gave his first statement about the South Carolina killing because he "didn't want to die" and "thought that by answering the questions [he] could live;" and then gave the later statement about the Florida murders because he had already made the first statement and might as well tell all.[19]

It is indisputable that in fact no physical force or coercion was ever used by any police officer against appellant. He explicitly acknowledges that no threats or violence was used to overbear his will.[20] The contention is that psychologically the statement was "mentally forced."[21]

However, appellant repeatedly refused to acknowledge any "fear" of the interrogating officers; his attitude towards them was rather one of hostility and distrust. He was suspicious and "security conscious" in his dealings with them.[22]

The psychiatrist called on appellant's behalf testified that a person in appellant's mental state might perceive a greater "threat to his life and survival than actually existed," in response to which he would "mobilize his inner resources in particular ways to try and protect himself against imminent destruction." This would evoke, not panic, "but rather an inner cold calculating effort to extricate himself from the situation." That very effort to avoid destruction might in fact be self-destructive. In the effort to avert a perceived short-term peril the person might run into a greater long-run danger.[23] Thus appellant might confess a crime to avoid incurring the sheriff's displeasure even if the confession might eventually harm him by resulting in his conviction for murder; just as a person might leap to his death from a window to escape attack by an imaginary assailant.

Although appellant's action was coldly "calculating deliberate, and willful,"[24] it was not, in the psychiatrist's opinion, "voluntary" in the legal sense.[25]

The case at bar apparently presents the familiar semantic conflict where the legal and medical professions speak different languages with respect to mental illness.

In view of both the appellant's own testimony and that of his medical witness, it would seem clear that for purposes of legally validating appellant's statements as admissible evidence they must be regarded as voluntary.

Appellant's misjudgment of the consequences of a calculated risk does not deprive his action of its voluntary character, any more than the missing Jimmy Hoffa's miscalculation of the loyalty of his confidants did. See *Hoffa v. U. S.*, 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

If an intentional and truthful statement must be deemed to be involuntary, merely by reason of imaginary dangers conjured up by an apprehensive suspect, a greater burden would be placed on law enforcement than any which judicial solicitude for persons charged with crime has hitherto created. There would be no objective standard for determining voluntariness, and no limit but the ingenuity of the defendant to the grounds for invalidity of confessions.

For the foregoing reasons, the judgment of the District Court of the Southern District of Florida is affirmed.

---

18. *Ibid.*, 216–17; Tr. 441, Broward County trial.

19. Tr. 206, 246, Palm Beach County trial; Tr. 441–42, 444, Broward County trial.

20. Tr. 440-441, Broward County trial; Tr. 219, 225, 238, Palm Beach County trial.

21. Tr. 444, Broward County trial. That in appropriate cases there can be coercion of a nonphysical nature which invalidates a confession is explained in *Leyra v. Denno*, 347 U.S. 556, 559-61, 74 S.Ct. 716, 98 L.Ed. 948 (1954).

22. Tr. 442, 447, Broward County trial; Tr. 205–206, 208, 226–27, 235–38, 240–41, Palm Beach County trial.

23. Tr. 290–92, 295, Palm Beach County trial.

24. *Ibid.*, 291, 295, 303.

25. *Ibid.*, 295, 297, 302–303.

GOLDBERG, Circuit Judge, dissenting:

Before responding to custodial interrogation, seventeen-year-old Ben Chaney asked to contact his mother. Disregarding that request, the police interrogated Chaney and elicited incriminating statements. The question before us is whether the state may rely on statements thus obtained to secure Chaney's criminal conviction. I would hold that it may not.

### I.

Our nation has long abhorred involuntary confessions. We have refused to tolerate their use both because their inherent unreliability risks conviction of the innocent and because they flout the respect for individual human dignity manifested in the requirement that no person "shall be compelled in any criminal case to be a witness against himself". U.S. Const. Amend. V. Neither the majority nor the state takes issue with the principle that a defendant's involuntary confessions are not admissible in evidence.

Chaney marshals impressive support for his claim that his statements were involuntary. He was hundreds of miles from home, suffered severe psychological problems, and harbored extreme fear of southern law enforcement officials stemming partly from the fact that some among them had brutally murdered his brother.[1] Ignoring Chaney's request to call his mother, the police succeeded in eliciting incriminating statements.

Chaney's involuntariness claim draws strength from *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). There the Supreme Court invalidated a conviction based upon a confession made after police had denied the suspect's request to call his wife. The defendant made "no claim that he was physically abused, deprived of food or rest, or subjected to uninterrupted questioning for prolonged periods." 373 U.S. at 504 n. 1, 83 S.Ct. at 1338. Nevertheless, the Court held that disregarding the request to call his wife rendered the statements involuntary.[2]

If, as *Haynes* indicates, conducting a stationhouse interrogation after refusing an adult's request to call his wife renders a subsequent confession involuntary, then surely refusing a psychologically disturbed minor's request to call his mother goes far toward establishing the same result.[3] Moreover, in the case at bar Chaney does not rely solely upon the inherent coerciveness of the situation, for he also adduced detailed and explicit medical testimony squarely supporting his claim that his statements could not have been voluntary.

### II.

I would not, however, decide this case on the issue of voluntariness. There is a simpler and more reliable ground, one comprehended by the landmark decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* announced that police conducting custodial interrogation must scrupulously honor a suspect's request to remain silent or to contact an attorney. Among the reasons for that requirement is that when police disregard such a request, the statements they subsequently elicit from the accused are unlikely to be voluntary. That is equally true of

---

1. Chaney is black. His brother was one of three civil rights workers murdered in Philadelphia, Mississippi in 1964 in what remains an infamous event.

2. Haynes contended that on the night of his arrest he requested both his wife and an attorney. 373 U.S. at 507, 83 S.Ct. 1336. The state disagreed. The Court found it unnecessary to determine which view of the record should be accepted, relying instead upon Haynes's uncontradicted story that on the next day the police refused his request to call his wife. 373 U.S. at 508–09, 83 S.Ct. 1336. Thus the Court ignored the alleged request for an attorney, and its holding turns wholly on the denial of the request to call the wife.

3. It is true that in *Haynes* the Court spoke of "incommunicado" detention, while in the case at bar the officials informed Chaney of his right to an attorney and presumably would have honored such a request. The crucial fact, however, is that here, as in *Haynes,* the police refused the request for outside help that the suspect did make. That they might have honored some alternative request provides little comfort.

requests by a minor to speak to his mother; indeed, it may be more true.[4] As Justice Rehnquist has noted for the Supreme Court, "prolonged isolation from family or friends in a hostile setting . . . might be sufficient to cause a defendant to accuse himself falsely." *Michigan v. Tucker*, 417 U.S. 433, 448–49, 94 S.Ct. 2357, 2366, 41 L.Ed.2d 182 (1974). *See also Haynes v. Washington, supra; Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Fikes v. Alabama*, 352 U.S. 191, 197, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). I would apply *Miranda's* salutary prophylactic rule and invalidate this conviction.

The case at bar provides an excellent illustration of the value of this aspect of *Miranda*. As indicated above, Chaney's displacement from home and his psychological makeup provided fertile ground for the application of subtle pressures. When confronted with numerous interrogating officials, Chaney's one attempt to combat the inherently coercive environment of the South Carolina jail was his request to call his mother. It was predictable and, indeed, unavoidable that denying that request would significantly increase the likelihood that any statement would be involuntary.

Few, I hope, would take issue with the proposition that law enforcement officials should honor a seventeen-year-old's request to call his mother before any interrogation. Long before the *Miranda* decision, the popular understanding was that every arrested person was entitled to one phone call. And the state readily concedes that the police would have been required to accede to a request for an attorney.[5] The accused who requests his mother rather than his ever-available attorney is the less knowledgeable, more easily coerced person most in need of protection from police overreaching. It makes no sense to protect the knowledgeable accused from stationhouse coercion while abandoning the young person who knows no more than to ask for the one person he trusts, his mother.

In reaching its result, the majority simply ignores the substantial contrary authority. In *People v. Burton*, 6 Cal.3d 375, 99 Cal. Rptr. 1, 491 P.2d 793 (1971), the California Supreme Court provided a thoughtful discussion of the issue and forthrightly announced the appropriate standard:

> [W]e hold that when, as in the instant case, a minor is taken into custody and is subjected to interrogation, without the presence of an attorney, his request to see one of his parents, made at any time prior to or during questioning, must, in the absence of evidence demanding a contrary conclusion, be construed to indicate that the minor suspect desires to invoke his Fifth Amendment privilege. The police must cease custodial interrogation immediately . . . .

6 Cal.3d at 383–384, 99 Cal.Rptr. at 6, 491 P.2d at 798.

*See also Commonwealth v. McCutchen*, 463 Pa. 90, 343 A.2d 669 (1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976) (minor's confession held inadmissible because he did not receive opportunity to contact parent; failure of minor to request parent held irrelevant); *Lewis v. State*, Ind., 288 N.E.2d 138 (1972) (same).[6] *But see State v. Young*, 220 Kan. 541, 552 P.2d

---

**4.** *Miranda's* language supports application of its holding to our situation:

> If the individual indicates *in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.

384 U.S. at 473–74, 86 S.Ct. at 1627 (emphasis added, footnote omitted). Requesting a parent indicates in unmistakable manner the individual's desire to remain silent pending compliance with the request.

**5.** The state has not questioned the continuing validity of *Miranda* and has not asserted that

*Miranda* violations should not be cognizable on habeas.

**6.** *Burton* held that the minor's request necessarily indicated a desire to remain silent pending compliance with the request, thus invoking *Miranda's* ban on further questioning. *McCutchen* and *Lewis* found the absence of a parent inconsistent with a knowing and intelligent waiver of the minor's constitutional rights. Under either formulation the result in our case would be the same.

905, 916 (1976) (honoring minor's request to contact father, while the "better practice," is not constitutionally required).

As an original matter, whether a police failure in this regard should require exclusion of the improperly adduced statements would present a controversial issue. I believe it should. No better method for encouraging police observance of reasonable standards has been suggested. Unless we are to return to the pre-*Miranda* days of futile, case-by-case inquiries into voluntariness—thus adding to our overcrowded dockets and removing much of the police incentive to act reasonably—we must adhere to the rule excluding statements made after the police have disregarded such a request for outside help. I remain convinced that steadfast enforcement of constitutional rights is the best way to achieve police observance of those rights and simultaneously to insure that justice is done. At any rate, *Miranda* remains the law of the land, and I know of no tenable reason for distinguishing between mother and lawyer in applying its mandate.

## CONCLUSION

Ben Chaney presents a persuasive claim that his statements were involuntary. The majority rejects rather impressive medical testimony on this issue, labeling that testimony a manifestation of the "familiar semantic conflict" between the legal and medical professions. While I readily concede that translating medical judgments into legal conclusions is no easy task, I submit that if Ben Chaney has not established involuntariness on the basis of his extensive medical and circumstantial proof, few defendants will ever be able to do so. It is therefore critical that we disapprove needless police tactics substantially increasing the likelihood that a defendant will make involuntary statements. I cannot say with assurance that Chaney's statements were involuntary; I do know that the need to speculate on this issue could have been significantly reduced had the police yielded to Chaney's reasonable request to make a single phone call.

*Miranda* is under severe siege. It may be battle lost, destined to become only a precious jurisprudential museum piece. But perhaps a few of its prophylactic strictures will survive, among them a liberal construction of the right to counsel or logical analogue before custodial interrogation ensues. I respectfully dissent.