**UNITED STATES of America ex rel. Thomas RILEY, Petitioner-Appellant,**

v.

**Gayle FRANZEN, Director, Illinois Department of Corrections, and Lou V. Brewer, Warden, Stateville Correctional Center, Respondents-Appellees.**

No. 80–2588.

United States Court of Appeals, Seventh Circuit.

Argued June 15, 1981.

Decided July 10, 1981.

Ralph Ruebner, Deputy State Appellate Defender, Chicago, Ill., for plaintiff-appellant.

Mark L. Rotert, Asst. Atty. Gen., Chicago, Ill., for respondents-appellees.

Before SWYGERT,* Senior Circuit Judge, PELL, and BAUER, Circuit Judges.

PER CURIAM.

Petitioner-appellant Thomas Riley appeals from a judgment, entered after an evidentiary hearing, denying his petition for a writ of habeas corpus. Riley argues that for two reasons the district court erroneously concluded that his confession, given during a custodial interrogation, properly was admitted into evidence at his state court trial. First, Riley asserts that by requesting to speak with his father during the interrogation he invoked his rights to silence and to the assistance of counsel, as delineated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that by failing to honor that request the police violated those rights. Riley also contends that his confession was involuntary. For the reasons given below, we affirm.

I.

A.

After a jury trial in the Circuit Court of Cook County, Illinois, Riley was convicted of two counts of murder and one count of involuntary manslaughter. He was sentenced to two concurrent terms of imprisonment of 75 to 225 years for the murder counts and to a term of imprisonment of 3 to 10 years for the involuntary manslaughter count, concurrent with the murder sentence. Prior to trial, Riley unsuccessfully moved to suppress his confession, present-ing, *inter alia*, the two arguments pressed in these habeas proceedings.

Riley's conviction was affirmed by the Illinois Appellate Court. *People v. Riley*, 49 Ill.App.3d 304, 7 Ill.Dec. 145, 364 N.E.2d 306 (1st Dist. 1977). That court also rejected Riley's challenges to the admissibility of his confession. The Illinois Supreme Court denied leave to appeal and, with Justices Brennan and Marshall dissenting, the Supreme Court denied certiorari. *Riley v. Illinois*, 435 U.S. 1000, 98 S.Ct. 1657, 56 L.Ed.2d 91 (1978).

Having exhausted his available state court remedies,[1] Riley filed a petition for a writ of habeas corpus in the district court urging as grounds for relief the two arguments presented here. In an unpublished decision, the district court denied the petition without a hearing. *United States ex rel. Riley v. Franzen*, 79–C–1681 (N.D.Ill. August 16, 1979) (McMillen, J.). However, in a previous appeal, we remanded with instructions to conduct an evidentiary hearing.[2] After the resultant evidentiary hearing, Judge McMillen made extensive findings of fact and again denied habeas relief. *United States ex rel. Riley v. Franzen*, 79–C–1681 (N.D.Ill. October 7, 1980) (Unpublished Memorandum). This appeal followed.

B.

For our purposes the facts regarding the homicides themselves are set forth adequately in the opinion of the Illinois Appellate Court. *People v. Riley*, 49 Ill.App.3d at 307, 7 Ill.Dec. 145, 364 N.E.2d 306. Conse-

---

* At the time of oral argument Judge Swygert was a circuit judge in active service; on July 1, 1981 he assumed senior status.

1. *See* 28 U.S.C. § 2254(b).

2. Specifically we stated:
 [T]he district court should conduct a hearing to determine with as much specificity as possible the historical facts relating to defendant's arrest, incarceration and subsequent confession. In particular, we believe that the district court should determine whether defendant was returned to the scene of the killings and, if so, for what purpose and for how long. It is also significant for the totali-ty of the circumstances test to determine whether and for how long defendant was manacled to the bars of his cell, how long defendant was clothed in only his underwear and a blanket, and whether and when defendant asked to speak with his father. We do not intend this list to be exhaustive by any means. The district court should resolve conflicts in testimony and determine facts necessary to conclude whether defendant's confession was voluntary.
 *United States ex rel. Riley v. Franzen*, 79–2029, Unpublished Order at 3 (7th Cir. April 7, 1980). 622 F.2d 590.

quently, those facts will not be restated here. However, the facts pertinent to our disposition of Riley's confession claims must be set forth in some detail. In this regard we note that Riley does not argue, nor does it appear, that the district court's findings are clearly erroneous. However, we have found it necessary to amplify those findings by utilizing the parties' stipulations which were submitted to the district court and by examining the evidentiary hearing transcript and state court record ourselves.

At approximately 5:15 p. m. on February 27, 1974, shortly after the shooting deaths of three young men at the Burr Oak Cemetery in Alsip, Illinois were reported to the police, Thomas Riley, then eight days short of his seventeenth birthday, and his brother Ernest, then eighteen years old, were arrested in connection with the homicides as they hitched a ride in the vicinity of the cemetery.[3] The brothers initially were stopped by officers Pennix and Moore of the Robbins Police Department.[4] Officer Pennix contacted the Alsip Police Department, which sent a patrol car driven by Alsip Police Officer Scaglione. Alsip Police Sgt. Rice also was present at this time.

Officer Scaglione drove the two brothers to the Burr Oak Cemetery.[5] According to Riley, the drive took approximately five or ten minutes, during which Officer Scaglione neither advised the brothers of their *"Miranda"* rights nor questioned them.[6] There were many police and police vehicles at the cemetery upon the brothers' arrival there. Officer Scaglione parked the squad car approximately seventy-five feet inside of the cemetery gate. There, the brothers sat inside of the squad car for approximately twenty minutes until they were taken to the Alsip Police Station. *United States ex rel. Riley v. Franzen,* 79–C–1681, Unpublished Decision at 4, Finding No. 4 (N.D.Ill. October 7, 1980) (hereinafter cited as "Decision"); E.H. at 19, 89; *see also* Stipulations, ¶ 10.[7]

---

**3.** No challenge is made to the validity of the arrest, obviating the need to discuss its circumstances, the bases for probable cause, and the like.

**4.** According to Riley, upon apprehending them Officer Pennix asked the brothers where the weapons were. The brothers responded "What weapons?" Then Officer Pennix said, "The weapons you niggers used to kill that guy with." Evidentiary Hearing Transcript at 15–16 (hereinafter cited as "E.H."). Officer Pennix, who is black, denied interrogating the brothers or referring to them as "niggers."

The district court made no specific findings on these factual issues. In this appeal Riley does not argue that Officer Pennix's interrogation or reference to him as "nigger," if true, rendered his confession involuntary. Also, because any statements made by Riley at this time apparently were not admitted at trial, we need not determine the propriety of Officer Pennix's interrogation, if any, of Riley immediately after he was apprehended. Consequently we leave these factual issues unresolved.

**5.** Riley testified that another police officer was in the squad car on the way to the cemetery. However, Officer Scaglione testified that he was alone with the two brothers with a second squad car following them to the cemetery. Again, we see no need to resolve this factual issue.

**6.** Officer Scaglione testified that Sgt. Rice may have advised the brothers of their *Miranda* rights. However, the parties stipulated that Riley was not given *Miranda* warnings at the time of his arrest.

**7.** The Illinois Appellate Court found that the brothers were detained at the cemetery for approximately one and a half hours. *People v. Riley,* 49 Ill.App.3d at 306, 7 Ill.Dec. 145, 364 N.E.2d 306. In our previous order we refused to afford a presumption of correctness under 28 U.S.C. § 2254(d) to this finding of fact because it was made by the state appellate court, rather than by the state trial court. *U. S. ex rel. Riley v. Franzen,* 79–2029, Unpublished Order at 2–3 (7th Cir. April 7, 1980). It is now clear that findings of fact made by a state appellate court must be given the benefit of the § 2254(d) presumption if the statutory criteria are satisfied otherwise. *See Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Neither party has briefed or argued the question of the effect of *Sumner,* which was decided after the district court's decision on remand in this case, upon this appeal in general or upon our review of the district court's finding on this factual issue in particular. However, in light of the consistency of the evidentiary hearing testimony of both sides' witnesses on this issue, Riley's relatively light emphasis upon the length of time spent at the cemetery while arguing that his confession was inadmissible, and the fact that no challenged statements were elicited during the time at the cemetery, we accept the district court's finding on this factual issue.

Essentially two things pertinent to our inquiry occurred during the brothers' stay at the cemetery. First, the body of one of the homicide victims covered by a blanket was lying in Riley's view. He "knew what was there but . . . no coercive reference was made to it by any police officer." Decision at 3–4, Finding No. 4. Also, "two young boys who had originally told the police where the suspects had fled were brought to the police car but were not able to identify the petitioner or his brother. The petitioner's father and stepmother had been brought to the cemetery but were not allowed any contact with the petitioner." Id. at 3, Finding No. 3; see also Stipulations, ¶ 12. There is no indication that Riley was interrogated at the cemetery or made any challenged statements while there.

Riley and his brother were driven from the cemetery separately. As Riley left the cemetery he was given Miranda warnings by a plainclothes police officer. Although Riley testified that he was "scared" and "nervous," E.H. at 23, he also acknowledged that he understood the warnings when they were read to him.

Riley arrived at the Alsip Police Station at approximately 6:00 p. m.

[His] clothing was taken for the purpose of a laboratory examination, but he was shortly thereafter allowed to put on his underclothes and socks. He was also given a blanket which he wrapped around his waist.[8] He was put in a cell next to his brother Ernest and, when they began conversing between themselves, a police officer handcuffed one hand of each boy to his respective bunk. This did not cause any particular discomfort, since the boys were able to sit down on their bunks, but it did prevent them from communicating further. This restraint was removed at or shortly after 8:00 p. m. Decision at 4, Finding No. 5 (footnote added).

During this initial two hour period in the police station Riley overheard the father of one of the victims "accost the older brother verbally. [The father] did not have any conversation with the petitioner, however." Decision at 6, Finding No. 8. Also, "[Riley's] older brother Ernest had told him that since [Riley] was a juvenile, he should take the 'weight' if any charges were made." Id. at 5, Finding No. 7.[9] Riley's father arrived at the police station at approximately 7:30 p. m.

At approximately 8:00 p. m. Riley's handcuffs were removed and he was given Miranda warnings. Riley replied that the warnings had been given twice previously. At this time, the interrogation of Riley was limited to questions concerning his age.

Without readministering Miranda warnings and having been misinformed by Riley's parents that Riley was seventeen years old, Sgt. Reed again spoke with Riley in his cell at approximately 8:30 p. m. Sgt. Reed told Riley that he would be prosecuted as an adult. Riley denied knowledge of the crimes, saying that he was looking for a job at the time of their commission. A neutron activation analysis was performed on Riley's hand to determine whether he had fired a gun and he was fingerprinted in an adjacent room.[10]

Riley was taken to the office of the Chief of Police for further questioning at about 9:00 p. m. Miranda warnings were not readministered. Riley was told that the clothing and hair samples would be ana-

---

**8.** The parties stipulated that Riley "was clad in underpants, socks and a blanket while being interrogated from 8:00 p. m. through 10:55 p. m." Stipulations, ¶ 12. However, Sgt. Reed testified that he was comfortable in his shirtsleeves while in Riley's cell.

**9.** "[Riley] was in fact about 8 days short of becoming 17 years old, but he had originally told the officers that he was 17. The officers attempted to verify his age as well as they could and reasonably believed that the petitioner was 17 before they proceeded in the questioning or took any statement." Decision at 5–6, Finding No. 7. The measures which the police took in trying to verify Riley's age included inquiries to his parents, both of whom told the police that Riley was seventeen years old.

**10.** Riley's hand twitched while the neutron activation analysis was being performed.

lyzed and of the purpose of the neutron activation analysis.

> [B]efore any statement was given by petitioner, he was told of the various investigative procedures which were being used and was advised of the evidence against himself as it was being collected by the police officers. This procedure was presumably an investigative technique to break down petitioner's reluctance to confess, but the information was truthful and unembellished.

Decision at 6, Finding No. 8.[11] Despite the denials of Sgt. Reed and Officer Jackson, the district court believed Riley's testimony that after he initially denied having been at the cemetery Riley requested to see his father.[12] At the evidentiary hearing, Riley made an offer of proof indicating that he wanted to ask his father to obtain an attorney for him. This is consistent with Riley's state court testimony. However, during the interrogation Riley did not indicate why he wanted to see his father. After his request was refused, Riley confessed to the homicides. While doing so, Riley was nervous; his voice cracked; and a tear appeared in one eye.

After confessing, Riley repeated what he had said in abbreviated form to his brother Ernest. He also signed a statement which was transcribed by a court reporter. The taking of that statement was completed at approximately 11:00 p.m. Following this interrogation session, Riley was fed a chicken dinner.[13] "After midnight [Petitioner] and [his brother] were permitted to see their father." Stipulations, ¶ 19.

## II.

Riley maintains that his request for his father was an invocation of his Fifth Amendment rights to silence and to counsel, apparently without distinguishing between these rights. However, the invocation of a defendant's right to silence may have a different impact on the permissibility of subsequent police conduct than the invocation of his right to counsel. *Compare Michigan v. Mosely*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (additional questioning of suspect who had invoked Fifth Amendment privilege permissible when preceded by "fresh" *Miranda* warnings and a significant time lapse), *with Edwards v. Arizona*, —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (interrogation of suspect who invokes right to counsel impermissible until suspect confers with counsel, unless he initiates subsequent contact with police). Consequently, the Supreme Court in *Mosely*, 423 U.S. at 101, n. 7, 96 S.Ct. at 325, n. 7, and this court in *Kennedy v. Fairman*, 618 F.2d 1242, 1248 n. 6 (7th Cir.), *cert. dismissed*, 449 U.S. 939, 101 S.Ct. 339, 66 L.Ed.2d 206 (1980), and *White v. Finkbeiner*, 611 F.2d 186, 193 n. 21 (7th Cir. 1979), *vacated and remanded*, —— U.S. ——, 101 S.Ct. 3000, 69 L.Ed.2d 385 (1981), have maintained a distinction between a suspect's *Miranda* rights to counsel and to remain silent. Thus, we cannot accept uncritically Riley's characterization of his request for his father.

First, we conclude that Riley's request was not an invocation of his right to

11. At the evidentiary hearing, Riley testified that Sgt. Reed commenced the interrogation by telling Riley that his brother Ernest had made a confession identifying Riley as the shooter, that the neutron activation analysis showed that Riley had fired a gun and that an eyewitness could prove that Riley had been at the cemetery. Sgt. Reed denied making these statements to Riley, although he did acknowledge telling Riley that two people of the brothers' descriptions had been viewed leaving the cemetery. Officer Jackson, who was in the office when Sgt. Reed supposedly made these statements, did not hear them.

In this appeal Riley does not argue that the district court's findings on this matter are clearly erroneous or incomplete. We view the court's findings as having discredited Riley's testimony in this regard. Consequently, we will assume that Sgt. Reed did not make the statements attributed to him by Riley.

12. The state trial and appellate courts also accepted this as true. *People v. Riley*, 49 Ill. App.2d at 310, 7 Ill.Dec. 145, 364 N.E.2d 306, *see also U. S. ex rel. Riley v. Franzen*, 79–2029, Unpublished Order at 2.

13. "[T]here is no evidence that [Riley] asked for anything or was intentionally deprived of food as a condition of giving a statement." Decision at 7, Finding No. 10.

silence. In *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), the Court reversed the judgment of the California Supreme Court which had held that a juvenile's request for his probation officer constituted an invocation of the defendant's Fifth Amendment privilege. The Court analyzed the request primarily to determine whether it could be construed as an invocation of the right to counsel.[14] However, it also rejected the argument that the request indicated a desire to remain silent.

> [T]here is nothing inherent in the request for a probation officer that requires us to find that a juvenile's request to see one necessarily constitutes an expression of the juvenile's right to remain silent.... In the absence of further evidence that the minor intended in the circumstances to invoke his Fifth Amendment rights by such a request, we decline to attach such overwhelming significance to this request.

442 U.S. at 724, 99 S.Ct. at 2571. Similarly, in this case we see nothing in the circumstances that warrants construing Riley's request for his father as an invocation of his right to silence. Consequently, we proceed to consider only whether that request constituted an invocation of his right to counsel.

■ The starting point for our inquiry into whether Riley's request for his father constituted a request for an attorney is *Miranda* itself. In that seminal case the Court stated, *inter alia*, that during a custodial interrogation "[i]f ... [the defendant] indicates *in any manner* and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." 384 U.S. at 444–45, 86 S.Ct. at 1612 (emphasis supplied). Plainly, Riley's request for his father was not an explicit expression of a desire to consult with an attorney, but because under *Miranda* a

request for an attorney need not be clear and unequivocal, *White v. Finkbeiner*, 611 F.2d at 189 n. 13, we must determine whether it reasonably may be so construed.[15] In the circumstances of this case we find that it may not.

The Court stated in *Miranda* that "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege ...." 384 U.S. at 469, 86 S.Ct. at 1625. This recognition of counsel's role in protecting a suspect's Fifth Amendment privilege is the basis for the pertinent aspect of the *Miranda* holding. *Fare v. Michael C.*, 442 U.S. at 719, 99 S.Ct. at 2568. Additionally, the Court acknowledged that a "lawyer's presence helps guard against overreaching by the police and ensures that any statements actually obtained are accurately transcribed for presentation into evidence." *Fare*, 442 U.S. at 719, 99 S.Ct. at 2569 (*citing Miranda*, 384 U.S. at 470, 86 S.Ct. at 1625). With these facets of "the unique role the lawyer plays in [our] adversary system of criminal justice" in mind, the Court in *Fare* determined that a juvenile's request for his probation officer did not constitute an invocation of his right to counsel. *Id.*

■ At least two of the factors relied upon in *Fare* support our conclusion that Riley's request for his father was not the functional equivalent of a request for an attorney. Riley's father is not trained in the law. Consequently, he was "not in a position to advise the accused as to his legal rights. Neither is he a trained advocate, skilled in the representation of the interests of his client before both police and courts." *Fare*, 442 U.S. at 719, 99 S.Ct. at 2569.[16]

■ A third factor present in *Fare* was the unprivileged nature of communications between a juvenile and his probation officer. The parties have not discussed wheth-

---

14. *This aspect of* Fare *is discussed below.*

15. This is the question which Riley pressed in the Supreme Court in his unsuccessful petition for a writ of certiorari. 435 U.S. 1000, 98 S.Ct. 1657, 56 L.Ed.2d 91 (Brennan and Marshall, dissenting.)

16. Another of the bases for *Miranda* discussed in *Fare*—to insure accurate transcription of the suspect's statements—is inapplicable here because Riley makes no challenge to the accuracy of the transcription of his confession.

er Riley's communications with his parent would have been privileged under Illinois law. However, we have not found any evidence that Illinois recognizes a parent-child privilege. Consequently, we doubt whether Riley's communications with his father, had Riley been allowed to speak to him in the stationhouse, would have been privileged because such a privilege did not exist at common law and courts have been reluctant to create new privileges, preferring to leave such matters to the legislature despite any policy reasons supporting recognition of a particular privilege. *E. g., Application of A and M*, 61 A.D.2d 426, 403 N.Y.S.2d 375, 380 (4th Dept. 1978) (declining to recognize parent-child privilege) ("Surely the thought of the State forcing a mother and father to reveal their child's misdeeds, as confessed to them in private, to provide the basis for criminal charges is shocking to our sense of decency, fairness, and propriety."); *In re Kinoy*, 326 F.Supp. 400 (S.D.N.Y.1970) (Frankel, J.) (same); *see generally* Wigmore, *Evidence*, § 2286 (McNaughton Rev.1961); McCormick, *Evidence*, § 77 (2d ed. 1973); Coburn, *Child-Parent Communications: Spare the Privilege and Spoil the Child*, 74 Dick.L.Rev. 599 (1970) (suggesting statutory creation of a parent-child privilege).

On the other hand, unlike the probation officer in *Fare*, Riley's father is not a state employee duty bound to report his son's wrongdoing. *See Fare*, 442 U.S. at 719–720, 99 S.Ct. at 2568–2569. This probably would be true in most cases. We believe, however, that the result in *Fare* is based primarily upon the Court's analysis of counsel's unique role in protecting a defendant's Fifth Amendment privilege and the inability of a probation officer to satisfy that role. 442 U.S. at 721, 723, 99 S.Ct. at 2570, 2571.[17] On this basis, we see no grounds upon which to distinguish the request in this case from the one at issue in *Fare*.

While *Fare* seems to preclude the possibility of ever construing a juvenile's request for his probation officer during a custodial interrogation as an invocation of the suspect's *Miranda* right to counsel, we decline to formulate such a broad rule with respect to requests for a parent or guardian. The parent-child relationship is appreciably different from that between a juvenile and his probation officer. A parent may significantly aid a juvenile in asserting his Fifth Amendment privilege. The parent may be, or be able to provide, an attorney for the child.[18] Even a lay parent, unlike a probation officer, may not encourage the suspect to talk with the police or feel bound to report any confession which the child may make in confidence. Indeed, because of these and other considerations, many states require parental consultation in order for a juvenile's confession to be admissible. *E. g., People v. Saiz*, 620 P.2d 15, 19 (Colo.1980) (*quoting* C.R.S. § 19–2–102(3)(c)(I) (1973)); *Lewis v. State*, 259 Ind. 431, 288 N.E.2d 138, 142 (1972); *but see State v. Young*, 220 Kan. 541, 552 P.2d 905 (1976); *Theriault v. State*, 66 Wis.2d 33, 223 N.W.2d 850, 854 nn. 11, 12 (1974) (collecting cases); *People v. Lara*, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202 (1967) (*In Bank*), *cert. denied*, 392 U.S. 945, 88 S.Ct. 2303, 20 L.Ed.2d 1407 (1968). While we believe that such a rule exceeds the requirements of the Constitution, it illustrates the important role that a parent may play during a custodial interrogation of a child and militates in favor of the case-by-case approach which we adopt with respect to requests for a parent.

The only federal case involving this issue which we have found is *Chaney v. Wainwright*, 561 F.2d 1129 (5th Cir. 1977), rehearing *en banc* denied, 570 F.2d 1391

---

**17.** The conclusion that the right to counsel recognized in *Miranda* is different than, but inextricably linked to, the defendant's right to silence is buttressed by the Court's continued maintenance of the distinction between the *Miranda* right to counsel and the Sixth Amendment right to counsel, which becomes effective

only after the commencement of formal criminal proceedings. *See Edwards v. Arizona*, 101 S.Ct. at 1882 n. 7.

**18.** In this case, apparently Riley's father unsuccessfully attempted to obtain a lawyer for his sons.

(1978), *cert. denied*, 443 U.S. 904, 99 S.Ct. 3095, 61 L.Ed.2d 871 (1979), in which the Fifth Circuit, with Judge Goldberg dissenting, affirmed the denial of a habeas petition by a defendant who was convicted of three murders. It suggests another factor for our analysis. At the time of his arrest the petitioner in *Chaney* was seventeen years and ten months old. After his arrest and after being given *Miranda* warnings, the petitioner did not request an attorney but unsuccessfully did request permission to telephone his mother. Afterward, he made incriminating statements which were admitted into evidence. In the habeas proceedings, he unsuccessfully contended that his statements were inadmissible under *Miranda* because his request for his mother constituted a request for counsel.

The *Chaney* court's rejection of the petitioner's contention was based in part upon its refusal to view the petitioner as a "child" for purposes of constitutional analysis. It noted that the petitioner had left home without saying good-bye to his mother or truthfully informing her of his plans. Also, the petitioner was streetwise; he knew he could have an attorney but did not want one. 561 F.2d at 1131–32. In other words, some juveniles are capable of independently exercising their *Miranda* rights. *E. g., United States v. Miller*, 453 F.2d 634 (7th Cir.) (per curiam), *cert. denied*, 406 U.S. 923, 92 S.Ct. 1790, 32 L.Ed.2d 123 (1972) (14 year old.)

Like the petitioner in *Chaney*, at the time of his arrest, for purposes of constitutional analysis, Riley certainly was no "child," although under state law he was a juvenile, albeit by a mere eight days. Riley was sufficiently independent of his parents and had sufficient understanding of his right to counsel that it is reasonable not to construe his request as one for an attorney. For at least six weeks before his arrest Riley had lived independently of his parents with his brother Ernest. He had had three previous stationhouse encounters with police, although these did not involve the recitation of *Miranda* warnings, interrogation, or the assistance of counsel. Additionally, Riley had quit school in the eighth grade, another indication of his independence from his parents. Finally, although Riley had scored 57 in a group IQ test in 1970, he testified that he understood the *Miranda* warnings when they were read to him. Thus, Riley knew that he had a right to speak with an attorney, and that one would be provided for him free of charge if he could not afford to hire a lawyer.

Riley relies upon *People v. Burton*, 6 Cal.3d 375, 99 Cal.Rptr. 1, 491 P.2d 793 (1971) (*In Bank*), in which the California Supreme Court, with one justice dissenting, held that a sixteen year old's request for his parents constituted an invocation of his privilege against self-incrimination. *Burton* was the basis for the California Supreme Court's judgment which was reversed in *Fare*. As discussed above, under *Fare* we find that Riley's request may not reasonably be construed as an invocation of his Fifth Amendment privilege. For this reason, we do not find *Burton* to be persuasive.

 To summarize, we do not hold that a juvenile's request for a parent or guardian must never be construed as a request for counsel or as an invocation of his Fifth Amendment privilege. Rather, we believe that the proper characterization of such a request depends upon an examination of the abilities of the parent or guardian requested on the one hand, and of the accused juvenile on the other. Lay parents must be distinguished from lawyers, or those with the ability to protect their child's Fifth Amendment privilege. Independent, older juveniles must be distinguished from younger ones, still living with their parents. "If it were otherwise, [any] juvenile's request for almost anyone he considered trustworthy enough to give him reliable advice would trigger the rigid rule of *Miranda.*" *Fare v. Michael C.*, 442 U.S. at 723, 99 S.Ct. at 2571. Also, a request which manifests the juvenile's desire to see his parent in order to obtain an attorney must be treated differently from a request, such as the one in this case, in which there is no such manifestation. Finally, a single re-

quest should be viewed differently than repeated requests, especially if the repetitions are in response to a series of police questions regarding the crime under investigation. Under some circumstances, the latter properly may be viewed as an invocation of the suspect's right to silence, if not of his right to counsel.

Moreover, because of the special problems associated with uncounseled confessions by juveniles, *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527 (1967), it probably is desirable as a 'matter of policy for police to consent to a juvenile suspect's request for his parents or guardian during an interrogation.[19] As discussed above, for this reason some states either by statute or through case law, prohibit the admission into evidence of the confession of a juvenile whose parent, guardian or attorney was not present when the child was advised of his rights, when the waiver decision was made, or both, even if no request for a parent was made.

Thus, we do not believe that Riley's request for his father constituted an invocation either of his right to silence or of his right to counsel. Consequently, the refusal to comply with that request did not deprive Riley of his *Miranda* rights. We also conclude that Riley's behavior during the interrogation constituted a valid waiver of his *Miranda* rights. *See Fare v. Michael C.*, 442 U.S. at 724–27, 99 S.Ct. at 2571–73 (applying implicit waiver doctrine of *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), to a juvenile). For these reasons, the admission into evidence of Riley's confession was proper under *Miranda*.

### III.

We also are satisfied that under the familiar totality-of-the circumstances test Riley's confession was voluntary. In determining the validity of a challenged confession the "constitutional inquiry is not whether the conduct of the state in obtaining the confession was shocking, but whether the confession was 'free and voluntary . . .' [*Bram v. United States*, 168 U.S. 532, 542, 18 S.Ct. 183, 186, 42 L.Ed. 568 (1897)]." *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).[20]

Riley argues that the district court erred in its application of the "totality" analysis because it failed to exercise "special care" as required by *Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) and *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948). More recently, regarding confessions by juveniles the Court also remarked:

> If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.

*In re Gault*, 387 U.S. at 55, 87 S.Ct. at 1458.

We do not view these cases as requiring us to give nearly dispositive significance to the age of the suspect, as Riley apparently would have us do. The Court's closing remarks in *Gallegos* are instructive:

> There is no guide to the decision of cases such as this, except the totality of

---

**19.** However, the police in this case apparently had valid reasons for denying Riley's request. Sgt. Reed mistakenly believed that Riley already had seen his father. Also, prior to Riley's request, Riley's father unsuccessfully had attempted to obtain a lawyer and had indicated that he did not wish to see his sons.

**20.** Because our focus is not on the conduct of the police but upon its effect upon Riley, we do not place great emphasis upon the district court's finding that the police had a proper purpose for bringing the two brothers to the cemetery—to have eyewitnesses view them for an identification. Decision at 3, Finding No. 3. We note that absent exigent circumstances such a suggestive identification procedure ordinarily is improper and might render a resultant identification inadmissible. *See Stoval v. Denno*, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *see also Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Because no identification was made at this time, however, we need not inquire into the propriety of this police conduct.

circumstances that bear on the two factors we have mentioned. The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend—all these combine to make us conclude that the formal confession on which this conviction may have rested (see *Payne v. Arkansas*, 356 U.S. 560, 568, 78 S.Ct. 844 [850], 2 L.Ed.2d 975, 981) was obtained in violation of due process.

370 U.S. at 55, 82 S.Ct. at 1213.

Also, although the test for establishing a valid waiver of a suspect's *Miranda* rights encompasses more than just voluntariness, *Edwards v. Arizona*, 101 S.Ct. at 1883–1884, the Court has found the traditional totality approach "adequate to determine whether there has been [such] a waiver even where interrogation of juveniles is involved." *Fare v. Michael C.*, 442 U.S. at 725, 99 S.Ct. at 2572.

■ The facts of this case are in stark contrast to those present in both *Gallegos* and *Haley*. In *Gallegos* the defendant was only fourteen years old, not nearly seventeen like Riley. Prior to signing his confession he had been in detention for five days, without his mother being allowed to see him. Here, Riley was detained for only approximately two hours before his first confession.

*Haley* is an even more extreme case. There, a fifteen year old boy was arrested at midnight and questioned by two policemen at a time in relays for five hours and shown his co-defendants' confessions before succumbing. Unlike Riley, he was not advised that he had a right to an attorney. Nor was he orally advised of his right to silence, although that information was contained on a written form which he was shown. Thereafter, the boy was held incommunicado for five days. 332 U.S. at 598, 68 S.Ct. at 303. Indeed, Justice Douglas in his plurality opinion observed: "What transpired would make us pause for careful inquiry if a mature man were involved." 332 U.S. at 599, 68 S.Ct. at 303.

Here, Riley was not mistreated. When his clothes were taken from him for testing, a blanket was provided. The room was not uncomfortably cool. Rather than being questioned incessantly over a long period immediately after his arrest, initially Riley was left alone in his cell. When Riley was questioned, he was familiar with one of the interrogators because Riley had worked on his car. As described above, the police did not attempt to exploit Riley's youth. Rather, they made extensive efforts to determine whether he was a juvenile, and only proceeded with the interrogation after they reasonably believed that he was not. Finally, even assuming that Riley was misinformed that his brother had confessed, as Riley alleges, that would not render his confession involuntary. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969).

Riley also relies upon *United States v. Fowler*, 476 F.2d 1091 (7th Cir. 1973), in which we reversed an order committing a sixteen year old to the custody of the Attorney General. The defect which we found in *Fowler* was that the youth was not adequately advised of his *Miranda* rights. 476 F.2d at 1092, n. 5. Thus, *Fowler* would not support reversal in this case because Riley acknowledges that he was given adequate *Miranda* warnings which he understood.

Upon consideration of Riley's characteristics, including his age and intelligence, and the circumstances surrounding his confession, we find that although he justifiably was emotionally upset his confession was made freely and voluntarily. It was not "the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re Gault*, 387 U.S. at 55, 87 S.Ct. at 1458.

AFFIRMED.