914 F.2d 255
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James Shaun ASHURST, Petitioner-Appellant,
v.
Terry L. MORRIS, Supt., Respondent-Appellee.
 No. 89-3502.
 United States Court of Appeals, Sixth Circuit.
 Sept. 11, 1990.
 
 Before NATHANIEL R. JONES and BOGGS, Circuit Judges, and GIBBONS, District Judge.*
 PER CURIAM.
 
 
 1
 Petitioner-Appellant James Shaun Ashurst appeals the denial of his habeas corpus petition filed under 28 U.S.C. Sec. 2254 (1988). For the following reasons, we affirm.
 
 I.
 
 2
 On the night of April 15, 1980, Ashurst encountered Johnny Miller, the murder victim, at a bar where they drank together. Co-defendant Cheryl Driskell called the bar and arranged to meet Ashurst and Miller. Shortly thereafter, she arrived with co-defendant Dale Slusher. The four then went driving and shoplifted beer and wine from a handicapped convenience store operator. All four then went to the apartment of Miller's girlfriend. Prior to that evening, Driskell and Slusher were upset with Miller, whom they blamed for the arrest of Rick Johnson, Driskell's former boyfriend, on theft charges. They also suspected Miller in the burglary of Johnson's apartment. When the four entered Miller's girlfriend's apartment, Driskell saw goods which she believed belonged to Johnson. Before leaving the apartment, either Slusher or Driskell stole a kitchen knife.
 
 
 3
 The four then drove out to a dead-end road in Miamiville, Ohio. Driskell pulled out a pellet gun from her purse, asked Miller about the stolen goods, and then proceeded to shoot him. Slusher then pulled Miller out of the car and attacked Miller with the kitchen knife. During the fight, Ashurst obtained a crowbar from the trunk of the car, and all three hit Miller with it. Finally, Slusher fractured Miller's skull with the crowbar. Miller died that night.
 
 
 4
 The next day, the police arrested Driskell, Slusher, and Ashurst. Ashurst was arrested at approximately 7:30 p.m. at the Miamiville Tavern. In the parking lot of the tavern, Ashurst was advised of his Miranda rights by the police. He made no statements at that time. After Ashurst was brought into the police station, he was held for eight and one-half hours in the "civil office" before the police began to talk to him. The reason for this delay was that the police investigated the murder scene and talked to both Driskell's mother and Slusher before confronting Ashurst. During this time, Ashurst was detained in a small room without windows. He chose not to sleep but "was not forced to remain awake." J.App. at 57 (Magistrate's Findings of Fact). Nor did he "display any obvious signs of intoxication or drug use at the time of arrest or during detention." Id.
 
 
 5
 During his time at the station, Ashurst asked two or three times to call his mother, and on each instance the desk officer denied the request. Ashurst did not make the request to the officers who talked to him, nor were they informed of his request. At 3:55 a.m., the questioning of Ashurst began, and lasted for about 35 minutes. The officers once again read Ashurst his Miranda rights, and after he waived his right to remain silent and his right to counsel, he confessed to the murder of Miller.
 
 
 6
 After his arrest, Ashurst was indicted for aggravated murder by the Clermont County (Ohio) Grand Jury. On July 7, 1980, the jury returned a verdict of guilty, and Ashurst was sentenced to life imprisonment. The state courts denied his appeals. On October 19, 1983, Ashurst filed a petition for habeas corpus in the United States District Court for the Southern District of Ohio. Ashurst alleged four errors in his habeas petition, only three of which are on appeal here (Ashurst has not appealed his argument concerning a violation of an Ohio state statutory procedure): (1) that his confession should not have been admitted at trial; (2) the trial court gave an improper jury charge regarding "prior calculation and design;" and (3) the State failed to establish prior calculation and design. The U.S. Magistrate and the district court denied the petition for the reasons outlined below.
 
 II.
 
 7
 Ashurst first argues that his requests to telephone his mother were akin to requests for counsel, after which all interrogation must cease.[1] Under the Fifth Amendment, a suspect is guaranteed the right to remain silent and to assistance of counsel. Miranda v. Arizona, 384 U.S. 436, 468-71 (1966).
 
 
 8
 The Magistrate rejected this argument, relying upon Fare v. Michael C., 442 U.S. 707 (1979). In Fare, a juvenile had asked to see his probation officer prior to interrogation, and this request was denied. The Court held that the request for a probation officer did not constitute a request for an attorney, which would have required all questioning to cease:
 
 
 9
 The rule in Miranda ... was based on this Court's perception that the lawyer occupies a critical position in our legal system because of his unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation....
 
 
 10
 Whether it is a minor or an adult who stands accused, the lawyer is the one person to whom society as a whole looks as the protector of the legal rights of that person in his dealings with the police and the courts....
 
 
 11
 A probation officer is not in the same posture with regard to either the accused or the system of justice as a whole. Often he is not trained in the law, and so is not in a position to advise the accused as to his legal rights. Neither is he a trained advocate, skilled in the representation of the interests of his client before both police and courts. He does not assume the power to act on behalf of his client by virtue of his status as advisor, nor are the communications of the accused to the probation officer shielded by the lawyer-client privilege.
 
 
 12
 Id. at 719. The Court added that the probation officer owes his allegiance to the State, whereas the lawyer represents his client. The Court then stated that the relationship of trust between the juvenile and the probation officer did not trigger the Miranda rule:
 
 
 13
 The fact that a relationship of trust and cooperation between a probation officer and a juvenile might exist, however, does not indicate that the probation officer is capable of rendering effective legal advice sufficient to protect the juvenile's rights during interrogation by the police, or of providing the other services rendered by a lawyer. To find otherwise would be "an extension of the Miranda requirements [that] would cut this Court's holding in that case completely loose from its own explicitly stated rationale." (citation omitted). Such an extension would impose the burdens associated with the rule of Miranda on the juvenile justice system and the police without serving the interests that the rule was designed simultaneously to protect. If it were otherwise, a juvenile's request for almost anyone he considered trustworthy enough to give him reliable advice would trigger the rigid rule of Miranda.
 
 
 14
 Id. at 722-23.
 
 
 15
 In United States ex rel. Riley v. Franzen, 653 F.2d 1153, (7th Cir.), cert. denied, 454 U.S. 1067 (1981), the Seventh Circuit considered a case very similar to our own: whether a defendant's request for his father during interrogation was tantamount to a request for counsel. In Riley, the Seventh Circuit noted that
 
 
 16
 [a]t least two of the factors relied upon in Fare support our conclusion that Riley's request for his father was not the functional equivalent of a request for an attorney. Riley's father is not trained in the law.... 'Neither is he a trained advocate....' [In addition,] we doubt whether Riley's communications with his father ... would have been privileged because such a privilege did not exist at common law and courts have been reluctant to create new privileges....
 
 
 17
 Id. at 1159-60. Although a father is not an employee of the state, like a probation officer, the court saw "no grounds to distinguish the request in this case from the one at issue in Fare. " Id. at 1160. It should be noted, however, that the Seventh Circuit declined to "formulate ... a broad rule with respect to requests for a parent or guardian" because a parent may "significantly aid a juvenile in asserting his fifth amendment privilege ... [and] may be, or be able to provide, an attorney for the child." Id. As such, the court ruled that "a case-by-case approach" for requests for parents is appropriate. Id. See also Chaney v. Wainwright, 561 F.2d 1129, 1131 (5th Cir.1977), cert. denied, 443 U.S. 904 (1979) (court refused to view petitioner, seventeen at the time of the crime, as a "child" because he was streetwise and not reliant upon his parents).
 
 
 18
 Ashurst attempts to distinguish Fare and Riley on the grounds that a parent will be able to guard against overreaching by the police and that the parent's presence will provide a countervailing pressure to the juvenile. Moreover, Ashurst contends that a parent may provide the juvenile's only access to an attorney, since most juveniles do not know attorneys or have the means to pay for one.
 
 
 19
 While we might conceive of circumstances in which a request for a parent or guardian might trigger a defendant's fifth amendment protection, we are inclined to agree with the reasoning and "case by case" approach taken by the Seventh Circuit in Riley.
 
 
 20
 Applying that reasoning to this case we find that Ashurst's requests to call his mother were not akin to a request for counsel. The Magistrate found that, "[W]hile the evidence showed that [Ashurst] thought highly of his mother, he displayed no signs of dependence on her counsel even though he lived at home. Instead, he engaged in frequent late night carousing and drug abuse with his friends." J.App. at 58. Further, Ashurst "possessed the independence required to hold down a part time job." Id. Such evidence of independence of mind and behavior suggest that Ashurst could not be understood to have mistaken a request to call his mother for a request for an attorney. We therefore conclude that Ashurst's requests to call his mother did not trigger his fifth amendment rights.
 
 III.
 
 21
 Next, Ashurst contends that under the totality of the circumstances test his waiver of his Miranda rights was not "knowing and voluntary" for two reasons: lack of capacity to understand the Miranda rights and lack of information about those rights. In cases where a suspect confesses to a crime, the government must prove that the waiver of the Miranda rights was "knowing and voluntary." These Miranda rights are guaranteed to juveniles as well as adults. In re Gault, 387 U.S. 1, 55 (1967). In order to determine whether a waiver by a juvenile is knowing and voluntary, a court must examine the totality of the circumstances, including "the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his fifth amendment rights, and the consequences of waiving those rights." Fare, 442 U.S. at 725.
 
 
 22
 A. Whether Ashurst had the Capacity to Waive his Rights
 
 
 23
 Ashurst contends that he lacked the understanding to waive his Miranda rights, and he points to several factors. He notes that at the time of his arrest, he was seventeen years old, a recent drop-out from tenth grade, and was living with his mother. He argues that his lack of maturity is an important factor in considering his capacity to understand waiver of rights. Ashurst also contends that the physical setting of his eight hour wait and his interrogation--a small windowless room--was such that he lacked free choice. In addition, Ashurst maintains that his consumption of drugs and alcohol on the day of his arrest and his lack of sleep rendered him unable to consent voluntarily to a waiver.
 
 
 24
 The Magistrate found that under the totality of the circumstances, Ashurst did have the capacity to waive his Miranda rights. This finding should not be disturbed unless clearly erroneous. See McCall v. Dutton, 863 F.2d 454, 459 (6th Cir.1988), cert. denied, 109 S.Ct. 1744 (1989). The Magistrate made the following findings of fact:
 
 
 25
 [Ashurst] did not display any obvious signs of intoxication or drug use at the time of arrest or during detention. Officer Cooper, who was at the arrest scene and present during interrogation, was highly trained and experienced at recognizing such signs of intoxication. Neither tiredness nor drug and alcohol [sic] resulted in an inability of petitioner to understand his Miranda rights or voluntarily waive them
 
 
 26
 .............................................................
 
 
 27
 ...................
 
 
 28
 * * *
 
 
 29
 Petitioner's intelligence is slightly below average, but he was fully able to understand his Miranda rights.... This Court fully credits the expert testimony of Dr. Gilbert to this effect.
 
 
 30
 J.App. at 57-58.
 
 
 31
 We agree that Ashurst had the capacity to understand the Miranda warnings read to him.
 
 
 32
 B. Whether Ashurst had Enough Information to Waive his Rights
 
 
 33
 Ashurst claims that his second Miranda warning at the police station was so confused that he did not fully understand the rights that he was waiving. He notes that several times he did not answer the question posed to him and at other times he responded, "uh huh." Miranda required that a defendant be "clearly informed" of his right to counsel in "clear and unequivocal terms." 384 U.S. at 467-68. Ashurst contends that the Miranda rights were read to him hurriedly and without explanation. In light of the fact that Ashurst spent most of his youth in the United Kingdom, he contends that he lacked the ordinary knowledge to understand the Miranda rights.
 
 
 34
 A tape from the evening interrogation reveals the following conversation:
 
 
 35
 DEP. UECKER: Okay, Jimmy, before I ask you any questions it's my duty under the Constitution and laws to advise you that you have the right to remain silent. You do not have to answer any questions which we may ask you. Do you understand this? You have to give us an--
 
 
 36
 ASHURST: Yeah, yeah.
 
 
 37
 DEP. UECKER: Any statement which you do make can and will be used against you in the event you're ultimately charged and tried before a court. Do you understand this?
 
 
 38
 ASHURST: Uh huh.
 
 
 39
 DEP. UECKER: You also have the right to have an attorney and if have an attorney you have the right to consult with him and have him present during this interrogation. Do you understand this?
 
 
 40
 ASHURST: Uh huh.
 
 
 41
 DEP. UECKER: In the event you do not have the funds to retain an attorney and it is your desire to consult with an attorney or have an attorney present during this questioning, then the questioning will not proceed until such time as an attorney is appointed by the Court to represent you. Do you understand this?
 
 
 42
 ASHURST: Uh huh.
 
 
 43
 DEP. UECKER: Jimmy, at this time we're investigating the aggravated murder of Johnny Miller. Having advised you of the rights which you have under the law, do you wish to waive your right against self-incrimination and to make a statement or answer our questions at this time? Let me go on. My next question will be, do you wish to waive your right to consult an attorney and have an attorney present during the interrogation? And the final question, I'll go back after I just want to get to the last one so you can hear everything before you, perhaps, say anything. Having waived the rights afforded you by law, I wish to further advise if at any time during the course of this questioning you wish to stop the interview and invoke your right against self incrimination then you have the right to refuse to answer any questions at any time. Do you understand that last one?
 
 
 44
 ASHURST: Uh huh.
 
 
 45
 DEP. UECKER: Where I said if you do want to talk, if you do want to answer our questions, anytime in the course of the interview if you want to stop that's your right to say, "Hey, I don't want to talk no more."
 
 
 46
 ASHURST: Go ahead and ask, I'll answer your questions.
 
 
 47
 DEP. UECKER: Well, do you wish to waive your right against self-incrimination and make a statement and answer our questions? I have to have either a yes or no from you on that.
 
 
 48
 ASHURST: Yeah, I'll answer your questions.
 
 
 49
 DEP. UECKER: Okay, do you want to have an attorney here present during this interview or do you wish to waive your right at this time?
 
 
 50
 ASHURST: Waive it.
 
 
 51
 J.App. at 202-204 (quoting from evening hearing at 75-77). Upon examination of this transcript, we conclude that the reading of the Miranda rights was clearly informative and Ashurst seemed to understand the rights which he was waiving. Although Ashurst was raised for a significant period of time in the United Kingdom, the Magistrate observed that "[he] was familiar enough with the American legal system to understand the word 'attorney' and thus to waive his right to consult with one. He had lived in the United States for over two years, very formative years, prior to his arrest." J.App. at 58.
 
 IV.
 
 52
 Ashurst's next assignment of error is that the trial judge gave an erroneous jury instruction on two issues. "The trial court is 'vested with broad discretion in formulating its charge and will not be reversed unless the charge fails accurately to reflect the law.' " United States v. Busacca, 863 F.2d 433, 435 (6th Cir.1988) (per curiam), cert. denied, 109 S.Ct. 1640 (1989) (citation omitted). "If an objection was made at trial, a reviewing court may reverse the trial court only if there is an abuse of discretion." Id.
 
 A. Aiding and Abetting
 
 53
 Under Ohio Rev.Code Sec. 2903.01(A), aggravated murder is defined as causing the death of another "with prior calculation and design." The trial court instructed the jury on the count of aiding and abetting an aggravated murder as follows:
 
 
 54
 An aider and abettor is one who aids, helps, assists, encourages, directs, or associates himself with another or others for the purpose of committing or participating in the commission of an offense. It would be necessary in this case that any participation of the defendant as an aider and abettor to assist Dale Lynn Slusher and/or Cheryl Ann Driskell would have to have been, on his part, purposely done.
 
 
 55
 J.App. at 169. Ashurst argues that this instruction created a mandatory presumption in violation of his constitutional rights. An instruction creates a mandatory presumption when it allows the jury to infer a presumed fact if the state proves certain predicate facts and if the presumed fact is an essential element of the offense charged. Sandstrom v. Montana, 442 U.S. 510 (1979). To determine whether there was a mandatory presumption, the entire charge must be considered. Id. Ashurst maintains that the jury charge allowed the jury to convict him of aiding and abetting an aggravated murder without proof of "prior calculation and design," but instead solely by proof of purposeful action.
 
 
 56
 We believe that the jury charge, when considered in its entirety, did not create a mandatory presumption. Three paragraphs after the charge quoted above, the court noted that:
 
 
 57
 If you find that the State failed to prove by evidence beyond a reasonable doubt evidence of prior calculation or design, then you must find the defendant not guilty of aggravated murder....
 
 
 58
 J.App. at 170. As the Magistrate noted, "[t]hese portions of the instruction clarified any ambiguity concerning the elements of aggravated murder and the state's burden of persuasion on each of the elements." Id. at 73.
 
 B. Intoxication
 
 59
 Ashurst argues that the court improperly instructed the jury on how intoxication affects his ability to form an intent. The court stated that "the burden is upon the defendant to establish by a preponderance [of the evidence] ... that at the time in question he was influenced by alcohol to such an extent that he was incapable of forming a purpose to commit the crime...." Id. at 173. Ashurst argues that because the instruction failed to mention "prior calculation and design," it created a mandatory presumption.
 
 
 60
 The State notes that Ashurst did not object to the intoxication instruction until the habeas petition. Ashurst responds that the intoxication instruction is not a separate ground for relief, but instead a factor which this court should consider in determining whether the aiding and abetting instruction was error. Upon review of the instructions as a whole, we think the jury was clearly and adequately instructed as to the requirement of "prior calculation and design" both for the establishment of the offense of aiding and abetting and in relation to the defense of intoxication. Therefore, we find no abuse of discretion on the part of the trial judge with respect to the challenged jury instructions.
 
 V.
 
 61
 Finally, Ashurst argues that there is insufficient evidence to prove that he acted with "prior calculation and design" beyond a reasonable doubt. An appellate court, in reviewing a district court's decision regarding sufficiency of the evidence, applies the same principles as the district court to the record before it. United States v. Connery, 867 F.2d 929, 930 (6th Cir.1989). The well-settled test is that "taking the evidence and inferences most favorable to the government, if there is such evidence that a reasonable mind might fairly find guilt beyond a reasonable doubt, the issue is for the jury." Id. See Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 62
 The Magistrate first noted that the evidence is sufficient if it "reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier-of-fact of prior calculation and design is justified. State v. Robbins, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979) ..." J.App. at 67. Resolving the conflicting inferences in favor of the State, the Magistrate found that a reasonable trier of fact could find that Ashurst acted with prior calculation and design on the basis of the following evidence:
 
 
 63
 Driskell and Slusher arranged to meet [Ashurst] and the victim at a bar on the evening of the murder; that the four individuals then spent several hours together driving to various locations; that [Ashurst] and each of his co-defendants had ill feelings toward the victim based on incidents that had occurred some weeks prior to the evening of the murder; that the reason [Ashurst] was involved in the murder was because the victim had caused one of his best friends to go to prison; that [Ashurst] knew his co-defendants were planning on taking some action against the victim in vengeance for wrongs they believed the victim had perpetrated against them and a friend; that prior to the murder, petitioner saw Driskell secret a knife in the car in which the victim and defendants were riding; and that after Slusher drove the car down a dead-end dirt road to the murder site and forcefully removed the victim from the car, [Ashurst] took the keys to the trunk of the car, unlocked the trunk, and removed a crowbar that he and his co-defendants used to beat the victim.
 
 
 64
 Id. at 68.
 
 
 65
 In State v. Jenkins, 48 Ohio App.2d 99, 355 N.E.2d 825 (1976), the court noted that in determining whether there was prior calculation and design, a court should consider three factors: (1) whether the defendant knew the victim, and if so, whether the relationship was strained; (2) whether thought and preparation were given by the defendant to the weapon used or the site of the murder; and (3) whether the act was drawn out over a period of time as opposed to an almost instantaneous eruption of events. Ashurst contends that there was no strained relationship between himself and Miller, as they were playing pool and drinking together. He also contends that he had no thought or preparation in selecting the crowbar or the site for the murder, and he maintains that the events occurred suddenly and without any prior thought--an instantaneous eruption of events.
 
 
 66
 Viewing the evidence in the light most favorable to the State, and considering the Jenkins factors, we find there was sufficient evidence to convict Ashurst. Ashurst's relationship to the victim was strained as a result of the alleged robbery by Miller and the connection to the arrest of Driskell's boyfriend. With respect to the thought given to the murder weapon, there was evidence that Ashurst saw Slusher steal the knife and observed Driskell carrying the pellet gun. Then Ashurst--on his own initiative--went to the trunk of the car and took out the crowbar, which ultimately killed Miller. Finally, while the events at the murder site occurred quickly, the sequence of events leading up to the murder shows that it was not an "instantaneous eruption of events." The defendants drove out to a dead-end street and then took turns beating Miller with the crowbar for fifteen minutes.
 
 VI
 
 67
 For the foregoing reasons, we AFFIRM the district court's denial of the petition for habeas corpus relief.
 
 
 
 *
 The Honorable Julia S. Gibbons, United States District Judge of the Western District of Tennessee, sitting by designation
 
 
 [1]
 At oral argument, Ashurst's counsel conceded that a rule requiring that questioning cease whenever an "interested adult" was asked for, even if adopted by this court, would not help Ashurst because new constitutional rules are not applicable to collateral review of a defendant's conviction. See Butler v. McKellar, 110 S.Ct. 1212, 1217-18 (1990). Therefore, we do not consider this issue